**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

| | |
|---|---|
| **MICHAEL AUSTIN RELLOQUE, IV**, | Case No. 3:22-cv-1781-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **CITY OF WEST LINN, MATTHEW GOODE, DANA GUNNARSON,** and **TODD GRADWAHL**, | |
| Defendants. | |

Beth A. Creighton and Kristin R. Bell, CREIGHTON & ROSE, PC, 735 SW First Avenue, Suite 300, Portland, OR 97204. Of Attorneys for Plaintiff.

David C. Lewis and Lauren E. Nweze, CIS LITIGATION, 15875 Boones Ferry Road, #1469, Lake Oswego, OR 97035. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

Plaintiff Michael Austin Relloque, IV, sues the City of West Linn ("City"), Matthew

Goode, an officer with the West Linn Police Department ("Police Department"), Dana

Gunnarson, an officer with the Police Department, and Todd Gradwahl, a sergeant with the

Police Department (Goode, Gunnarson, and Gradwahl are "Defendant Officers," collectively).[1] Relloque brings claims against the Defendant Officers under 42 U.S.C. § 1983 for violations of Relloque's Fourteenth Amendment rights, and state-law claims for negligence and intentional infliction of emotional distress ("IIED") against all Defendants. Defendants move for summary judgment on all Relloque's claims. For the reasons explained below, the Court grants in part and denies in part Defendants' motion.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see also Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'" (quoting *Celotex*, 477 U.S. at 325)). "Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). "If the moving party meets its initial burden, the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that

---

[1] Relloque sues the Defendant Officers in both their individual and official capacities.

there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).

The Court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson*, 477 U.S. at 252, 255. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## BACKGROUND

Shortly after midnight on November 14, 2020, Relloque's roommate, Melissa Birdwell, placed a call to 911. ECF 43-2 at 1; ECF 37-2 (audio recording of 911 call). Birdwell told the operator that Relloque was "acting crazy" and might be on drugs, came into her room naked with markings all over his body, shouted "I am God" and was talking and yelling to himself, had burned himself and smelled like burned skin, and might need medical care. ECF 37-2.[2] Birdwell had locked her bedroom door and Relloque had kicked it open, so Birdwell hid in her bathroom. *Id.* While in the bathroom and on the phone with 911, Birdwell heard what sounded like a hair clipper. ECF 43-19 at 9 (Birdwell Depo. Tr. 25:16-20). Birdwell made her way to the front yard while still on the phone with 911. ECF 37-2. She last saw Relloque inside the house, where he

---

[2] In Birdwell's deposition, she stated that when she saw Relloque in her room, she believed that he had a significant injury to his hands and she believed she conveyed this to dispatch. ECF 43-19 at 12 (Birdwell Depo. 28:14-22).

was alone, and Birdwell believed that Relloque was now upstairs in his bedroom or bathroom. *Id.* The 911 operator asked Birdwell for her roommate's name and phone number, and she told them his name was Michael Relloque and provided his cell number. *Id.* Dispatch listed the call as a Behavioral Health Call. ECF 43-2 at 2.

The Defendant Officers arrived a few minutes after Birdwell called 911, and Birdwell told them "the quick version" of what she told the 911 operator: that Relloque had been "naked and standing at the top of stairs yelling, 'I am god,'" "had what looked like ash or dirt on his chest and arms," and that "he looked like he may have a burn or blood on his arm." ECF 37-3 at 1. Birdwell also told the Defendant Officers that Relloque had taken mushrooms. ECF 37-4 at 1. The officers "felt concerned Relloque could have a[n] injury to his arm" and believed that he "was likely hallucinating on mushrooms." ECF 37-3 at 1. American Medical Response and Tualatin Valley Fire & Rescue had also been dispatched based on Birdwell's call. ECF 37-4 at 1. Goode had an EMT certification and was trained in treating people in altered states due to illicit substances, ECF 43-21 at 2-3 (Goode Depo. 7:14-19, 10:9-19).

Birdwell provided Relloque's cellphone number to Gunnarson, who tried calling it but did not get an answer. ECF 37-4 at 1. Birdwell told the Defendant Officers which vehicle was Relloque's, and Goode ran the vehicle plate and obtained Relloque's information. ECF 43-4 at 1; ECF 37-4 at 1. Goode stated that he never saw a Law Enforcement Data Systems printout on Relloque, but he did see Relloque's DMV return, which did not include a picture or ethnic data. ECF 37-5 at 13 (Goode Depo. 99:4-25). Gradwahl also stated that he did not run any checks, ECF 37-6 at 6 (Gradwahl Depo. 52:18-20), and that he did not see a picture of Relloque when he was on the scene or know Relloque's race, ECF 37-6 at 9 (Gradwahl Depo. 56:5-18). Birdwell stated that the Defendant Officers asked her what Relloque's race was, and that she said that he

could be Hispanic but she was not sure. ECF 43-19 at 14-15 (Birdwell Depo. 30:10-31:6).

Birdwell also stated during her deposition that while on the scene, the Defendant Officers told

her that

> [she] should let [Relloque] like ride out his high in the house and
> [she] go find somewhere else to stay for the night, and because
> [she] didn't know that if he were like armed or had a weapon, they
> didn't want to go into the house and have to use excessive force,
> and they did mention that because of in lieu of like the current like
> state of the police riots and all of that, like they didn't want to have
> to do that, go in and use excessive force.

*Id.* at 20 (Birdwell Depo. 36:15-24).

Shortly after arriving on scene, Gradwahl yelled for Relloque to "let us know he was

inside and to come talk to us but did not get a reply." ECF 37-4 at 1. At this point, the Defendant

Officers did not believe that a crime had been committed, and Birdwell had a place to stay with

her boyfriend, who was now on scene. ECF 37-3 at 1; ECF 37-4 at 1-2. The Defendant Officers

walked around the house and looked inside but could not see "anything out of the ordinary" or

any blood, signs of fire, or people in the residence. ECF 37-4 at 1; ECF 37-3 at 2. Gradwahl rang

the doorbell "at least twice" and did not get a response or see or hear movement inside the house.

ECF 37-4 at 1. Goode "made several attempts using his PA system to get a response" from

Relloque, and the Defendant Officers did not hear a response or see movements. *Id.* The

Defendant Officers "reached the consensus that due to Relloque's unpredictable nature, the

absence of a crime, and lack of knowledge that Relloque was an immediate danger to himself,

the governmental interest was not high enough to enter the private residence absent additional

information." ECF 37-3 at 2. After more than 60 minutes on the scene, the Defendant Officers

left. *See* ECF 37-4 at 1 (Gradwahl's report stating event end time of 1:27 a.m.); ECF 43-21 at 40

(Goode Depo. 106:8-10) (Goode's GPS showing that he left the location sometime between 1:25

and 1:27 a.m.). Gradwahl later drove by the residence at about 4 a.m. so that he could pass on an update to the day shift. ECF 43-20 at 39-40 (Gradwahl Depo. 118:6-119:24).

The next morning at about 7:00 a.m., Birdwell again called 911 to report that she found a severed finger in the toilet. ECF 37-9 at 1; ECF 43-16 at 2. The responding officer, Larry Redler, observed mushrooms on the floor and on a cutting board in Relloque's room, and stated that "it was obvious Mr. Relloque experienced a 'bad trip' the night before." ECF 37-9 at 1. Birdwell provided Relloque's phone number to Redler, who called the number, and it went straight to voicemail. *Id.* Redler "believed Mr. Relloque's welfare was in danger" and asked the police to "ping" the location of Relloque's phone, which pinged in North Salem. *Id.* Redler later received a call from a Marion County Sheriff's Deputy, who stated that at 6:30 a.m., he was dispatched to Turner, Oregon and found Relloque disoriented and severely burned. *Id.* at 2. Relloque was transported to Legacy Emanuel's burn center, where he was found to have 6 missing fingernails and severe burns to 20-29 percent of his body, mainly his arms and torso. *Id.*; ECF 43-32 at 1.

In Relloque's deposition, he stated that he had recently foraged for hallucinogenic mushrooms on November 13, 2020. ECF 37-10 at 2 (Relloque Depo. 88:16-25). He may have eaten dinner, then smoked marijuana, lit a fire in the fireplace, and meditated. *Id.* at 6 (Relloque Depo. 92:15-24). After meditating, he made and ingested mushroom tea. *Id.* at 8 (Relloque Depo. 94:14-20). Relloque stated that he could not "recall anything like accurately by any means after meditating, after the session of meditation." *Id.* at 11 (Relloque Depo. 97:9-11). He did say that he believed he got burned because he was meditating in front of the fire, then began "feeling like a sense of like ecstatism or euphoria," and then remembers "coming to like recognizing that [he] was inside the fire." *Id.* at 11-12 (Relloque Depo. 97:23-98:13). Relloque remembered going to Birdwell's room, *id.* at 12, 21 (Relloque Depo. 98:14-20, 107:15-108:3), and stated that

he believed that at the time he went into Birdwell's bedroom, he had already been burned, *id.* at 16 (Relloque Depo. 102:17-25). He also remembered using hair clippers "after coming out of [Birdwell's] room." *Id.* at 24 (Relloque Depo. 110:9-15).

## DISCUSSION

### A. Evidentiary Objections

The parties dispute whether several items of evidence are admissible. In evaluating the nonmoving party's facts offered at summary judgment, the Court does "not focus on the admissibility of the evidence's form. [The Court] instead focus[es] on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003); *see also Celotex*, 477 U.S. at 324 ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment."). At summary judgment, the Court may consider "evidence submitted in an inadmissible form, so long as the underlying evidence could be provided in an admissible form at trial, such as by live testimony." *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016); *see also Sandoval v. County of San Diego*, 985 F.3d 657, 665-66 (9th Cir. 2021) (rejecting relevance, hearsay, and foundation evidentiary objections at summary judgment and noting that "[i]f the contents of a document can be presented in a form that would be admissible at trial—for example, through live testimony by the author of the document—the mere fact that the document itself might be excludable hearsay provides no basis for refusing to consider it on summary judgment"); *cf.* Fed. R. Civ. P. 56(c)(2) (permitting a party to "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence"); 56(c)(4) (establishing that a declaration in support of summary judgment must present "facts that would be admissible in evidence").

1.  **Exhibits and References to *Fesser v. City of West Linn*, George Floyd, or Breonna Taylor**

Defendants object to Relloque's exhibits 4, 7, 12, 14, and 15 (ECF 43-3, 43-5, 43-7, 43-9, and 43-10) on the grounds of hearsay and relevance. Defendants also object to any references to or news articles about George Floyd or Breonna Taylor as irrelevant because the Defendant Officers were not involved in the Floyd or Taylor incidents. Relloque responds that the exhibits are not offered for the truth of what they assert, but as evidence of the "political atmosphere surrounding policing during the events at issue" and to the effect of the evidence on the listener or reader. Thus, Relloque argues that the exhibits are relevant to provide context for the Defendant Officers' conduct and thought processes.

Relloque, however, does not provide evidence that any of the Defendant Officers were aware of or had read these exhibits; therefore, the exhibits cannot be offered for their effect on the listener or reader. The exhibits also do not fall under any hearsay exception. But the underlying evidence—that the Police Department had been involved in a case involving alleged racial discrimination shortly before the events at issue here—may be admissible in another form. These exhibits are relevant to the context of the events. Therefore, the Court overrules this objection to this extent.

2.  **Exhibit 2 (Labeled as Exhibit 8): Relloque's Driver's License**

Defendants object to this exhibit as irrelevant because there is no evidence in the record that Defendants saw Relloque's driver's license. Relloque does not respond to this objection.[3]

---

[3] "Irrespective of [a party's] lack of response, the Court has an affirmative obligation to determine the admissibility and propriety of the evidence before it." *La Jolla Spa MD, Inc. v. Avidas Pharms., LLC*, 2019 WL 4934178, at *9 n.6 (S.D. Cal. Oct. 7, 2019).

This exhibit, however, is irrelevant to the current motion. Thus, the Court sustains this objection.

### 3.  Exhibit 8: Post-Incident Photos of Relloque

Defendants object to these photographs as irrelevant because they were undisputedly taken after the events at issue and do not accurately reflect how Relloque appeared during the relevant time. Defendants also argue that the photographs are unfairly prejudicial and that Relloque had been cleaned up before the photographs were taken. Relloque responds that these photographs are evidence to rebut Defendants' contention that Relloque had already suffered the full extent of his injuries by the time the Defendant Officers arrived at the residence. Further, Relloque argues that the fact that his injuries had been cleaned would *improve* their appearance and thus not cause undue prejudice to Defendants.

At the summary judgment stage, the photographs are relevant. Many of Defendants' arguments depend on their assertion that Relloque had suffered all his injuries before the Defendant Officers arrived at the residence. These photographs demonstrate Relloque's injuries at the time he was hospitalized and serve as a contrast to Birdwell's description of Relloque's injuries. Thus, the Court overrules this objection.

### 4.  Paragraphs of Relloque's Declaration

Defendants object to multiple paragraphs of Relloque's declaration, ECF 40, as directly contradicted by his prior sworn deposition testimony and move to strike certain of his statements under the sham affidavit rule. Relloque responds that the statements that Defendants identify are not sufficiently contradictory to trigger the sham affidavit rule.[4]

---

[4] Relloque also argues that, to the extent Defendants intended this as a motion to strike, it is not properly before the Court under Local Rule 7-1(b), which requires that "[m]otions may not be combined with any response, reply, or other pleading." Evidentiary objections, however,

The sham affidavit rule applies only when "the inconsistency between a party's deposition testimony and subsequent affidavit [is] clear and unambiguous." *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998-99 (9th Cir. 2009). "[N]ewly-remembered facts, or new facts, accompanied by a reasonable explanation, should not ordinarily lead to the striking of a declaration as a sham." *Yeager v. Bowlin*, 693 F.3d 1076, 1081 (9th Cir. 2012) (citing *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 806-07 (1999). "The non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition and minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit." *Van Asdale*, 577 F.3d at 999 (cleaned up).

The discrepancies that Defendants point to do not establish a clear and unambiguous inconsistency. For example, Defendants distinguish between Relloque's statement in his declaration that he "smoked less than a bong bowl of cannabis" and his deposition statement that he could have smoked the whole bowl, and between Relloque's statement in his declaration that he was "about 3 feet from the fireplace" and his deposition statement that he was within "arms reach" of the fire. These "minor inconsistencies" do not warrant exclusion of paragraphs of Relloque's declaration. Thus, the Court overrules this objection.

### 5. Declaration of Dr. Mark Baskerville

Defendants object that Dr. Baskerville's declaration and CV, ECF 42, do not mention experience, training, or expertise that would qualify him to opine on the community standard of care for law enforcement officers or EMTs. Thus, Defendants argue that this testimony is

---

properly may be combined with a reply. The Court thus considers Defendants' evidentiary objections to Relloque's declaration.

improper under Rules 702, 703, and 705 of the Federal Rules of Evidence. Relloque responds that as a board-certified emergency medicine physician, Dr. Baskerville is qualified to provide expert testimony on the EMT practice area.[5] Relloque cites the American Board of Medical Specialties' definition of an emergency medicine physician as one who "focuses on the immediate decision making and action necessary to prevent death or any further disability *both in the pre-hospital setting by directing emergency medical technicians* and in the emergency department."[6]

Defendants are correct that Dr. Baskerville is not qualified to provide an expert opinion on the standard of care for law enforcement officers. But Dr. Baskerville is board-certified in emergency medicine and has "taught emergency providers, including first responders, for nearly three decades." ECF 42 ¶ 1. He is therefore sufficiently qualified to opine on the standard of care for emergency medical providers. The Court overrules this objection to this extent.

## B. Section 1983 Claims

Relloque brings two § 1983 claims against the Defendant Officers for violations of his Fourteenth Amendment rights. Relloque first alleges that the Defendant Officers affirmatively put him in a position of danger and increased the risk of harm to him, constituting a state-created danger. Second, Relloque asserts that the Defendant Officers discriminated against Relloque and

---

[5] Relloque also argues that courts in this district have accepted expert testimony from emergency medical physicians about the standard of care for EMTs, citing *Nattell v. Curry County*, 2013 WL 5372539 (D. Or. Sept. 23, 2013). In *Nattell*, however, the court did not rely on expert testimony about the standard of care for EMTs.

[6] American Board of Medical Specialties, *American Board of Emergency Medicine*, https://www.abms.org/board/american-board-of-emergency-medicine/#abem-em (emphasis added).

chose not to render assistance to him based on his race. Defendants argue that the Defendant Officers are entitled to summary judgment on these claims because the Defendant Officers did not violate Relloque's Fourteenth Amendment rights. Defendants also contend that, if the Court finds that Relloque's rights were violated, the Defendant Officers are entitled to qualified immunity because any rights are not clearly established.

Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage of any State[,] . . . subjects, or causes to be subjected" any person within the jurisdiction of the United States the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. To establish § 1983 liability, a plaintiff must prove "(1) deprivation of a right secured by the Constitution and laws of the United States, and (2) that the deprivation was committed by a person acting under color of state law." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1138 (9th Cir. 2012) (quotation marks omitted).

### 1. State-Created Danger

A state generally does not have a duty under the Due Process Clause to protect individuals from third parties. *Morgan v. Gonzales*, 495 F.3d 1084, 1093 (9th Cir. 2007). One exception to this rule is the state-created danger doctrine, under which state actors "may be held liable where they affirmatively place an individual in danger by acting with deliberate indifference to [a] known or obvious danger in subjecting the plaintiff to it." *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1062 (9th Cir. 2006) (cleaned up). To succeed on this claim, Relloque must establish three elements: (1) "the officers' affirmative actions created or exposed [him] to an actual, particularized danger that [he] would not otherwise have faced"; (2) "the injury [he] suffered was foreseeable"; and (3) "the officers were deliberately indifferent to the known danger." *Martinez v. City of Clovis*, 943 F.3d 1260, 1271 (9th Cir. 2019). For the first element,

courts consider "whether the officers left the person in a situation that was more dangerous than the one in which they found" them. *Id.* (quotation marks omitted).

Beginning with the first element, Defendants argue that the Defendant Officers' conduct did not have any effect on the danger that Relloque faced. Relloque responds that there is evidence that he suffered further injuries after the Defendant Officers left and that the Defendant Officers' conduct exposed him to a new danger.

Relloque cites two cases in which the Ninth Circuit found that the state-created danger applied and argues that they are like the facts here. *See Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082 (9th Cir. 2000); *Penilla v. City of Huntington Park*, 115 F.3d 707 (9th Cir. 1997) (per curiam). In *Munger*, police "affirmatively ejected [the plaintiff] from a bar late at night when the outside temperatures were subfreezing." 227 F.3d at 1087. The officers knew that the plaintiff "was wearing only a t-shirt and jeans, was intoxicated, was prevented by the officers from driving his truck or reentering [the bar], and was walking away from the nearby open establishments." *Id.* The Ninth Circuit held that the officers placed the plaintiff in "a more dangerous position than the one in which they found him." *Id.*

In *Penilla*, a plaintiff was on his porch and became seriously ill, such that his neighbors and a passerby called 911 for emergency medical services. 115 F.3d at 708. Upon arriving, the officers examined the plaintiff, "found him to be in grave need of medical care, cancelled the request for paramedics, broke the lock and door jamb on the front door of [plaintiff's] residence, moved him inside the house, locked the door, and left." *Id.* The plaintiff was found dead of respiratory failure the next day. *Id.* The Ninth Circuit explained that the this conduct "clearly placed [plaintiff] in a more dangerous position than the one in which [the officers] found him. . . . [B]y cancelling the 911 call, removing [plaintiff] from public view, and locking the

front door, the officers made it impossible for anyone to provide emergency medical care to [plaintiff]." *Id.* at 710.

These cases differ in a critical respect from the situation here: the defendants in *Munger* and *Penilla* took affirmative acts that put the plaintiffs in a worse position. *See Kennedy*, 439 F.3d at 1062 n.2 (explaining that in a state-created danger analysis, "it is proper to consider whether the conduct at issue was an affirmative act or an omission"); *Penilla*, 115 F.3d at 710 ("The critical distinction is not, as appellants allege, an indeterminate line between danger creation and enhancement, but rather the stark one between state action and inaction in placing an individual at risk."). Here, the Defendant Officers did not take "an affirmative act that created an actual, particularized danger," but merely left without reaching Relloque. *Martinez*, 943 F.3d at 1272 (cleaned up). The Defendant Officers "did not make the situation worse" for Relloque, but "simply left [him] in the same position [he] was in before the police had arrived" and that he "would have been in had [the Defendant Officers] not responded to the 911 call." *Id.* Viewing the facts in the light most favorable to Relloque, there is no genuine dispute that the Defendant Officers did not take any affirmative acts and did not leave Relloque in a worse position than he was in when they found him. The Court thus grants Defendants' motion for summary judgment as to this claim and does not reach the issue of whether the Defendant Officers are entitled to qualified immunity.

## 2. Equal Protection

The Fourteenth Amendment guarantees equal protection of the law. The purpose of the Equal Protection Clause is "to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (internal citations and quotation marks omitted). Under the Equal

Protection Clause, "all persons similarly circumstanced shall be treated alike" by government entities. *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920). "To succeed on a § 1983 equal protection claim, the plaintiffs must prove that the defendants acted in a discriminatory manner and that the discrimination was intentional." *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 740 (9th Cir. 2000).

Defendants first argue that the Defendant Officers were not aware of Plaintiff's physical appearance or his race when they were on the scene, and thus they could not have a discriminatory motive. Gradwahl and Gunnarson stated in depositions that they had not seen a picture of Relloque and did not know Relloque's race when they were on the scene. ECF 37-6 at 9 (Gradwahl Depo. Tr. 56:5-18); ECF 37-7 at 3 (Gunnarson Depo. Tr. 37:3-11). Relloque responds that the Defendant Officers asked Birdwell what Relloque's race was, and she told them that he could be Hispanic. *See* ECF 43-19 at 14-15 (Birdwell Depo. 30:21-31:6). In Gradwahl's interview with an independent investigator, however, he reiterated that Birdwell never told him Relloque's race and that based on Birdwell's description of Relloque as having tan skin and dark hair, Gradwahl believed that Relloque was white. ECF 45, Ex. 40. Relloque also argues that Birdwell showed the Defendant Officers a picture of Relloque while the officers were on the scene, citing Gradwahl's interview with the independent investigator. *Id.* But in this interview, Gradwahl stated that he did not see a picture of Relloque until a couple of days after the incident. *Id.* Further, Birdwell stated in her interview that she did not remember if she showed the Defendant Officers a picture of Relloque when they were at the residence, and later found her text messages with one of Defendants in which she sent him a picture of Relloque about an hour after the Defendant Officers had left the residence. ECF 45, Ex. 18. Viewing this

evidence in the light most favorable to Relloque, there is a genuine dispute as to whether the Defendant Officers knew Relloque's race at the time that they were at the residence.

Defendants, however, contend that there is no evidence that they were motivated by any discriminatory animus. Relloque responds that the Defendant Officers told Birdwell that "because [she] didn't know that if he were like armed or had a weapon," and because of the "current like state of the police riots and all of that, like they didn't want to have to do that, go in and use excessive force." ECF 43-19 at 20 (Birdwell Depo. 36:19-24). When later asked in the same deposition if the Defendant Officers made any reference to Relloque's race when making this statement, Birdwell said no. ECF 49-2 at 3-4 (Birdwell Depo. 61:25-62:5). Viewing this evidence in the light most favorable to Relloque, no reasonable juror could find that these statements evidence a discriminatory motive. According to Birdwell, the Defendant Officers cited their lack of information about Relloque's access to weapons in explaining their decision not to enter the residence. Although the contemporaneous police riots may have involved people of color, the Defendant Officers did not mention race. The Court thus grants Defendants' motion for summary judgment as to Relloque's equal protection claim and does not reach the issue of whether the Defendant Officers are entitled to qualified immunity.

## C. Negligence

Common-law negligence under Oregon law generally requires:

> (1) that defendant's conduct caused a foreseeable risk of harm, (2) that the risk is to an interest of a kind that the law protects against negligent invasion, (3) that defendant's conduct was unreasonable in light of the risk, (4) that the conduct was a cause of plaintiff's harm, and (5) that plaintiff was within the class of persons and plaintiff's injury was within the general type of potential incidents and injuries that made defendant's conduct negligent.

*Solberg v. Johnson*, 306 Or. 484, 490-91 (1988), *abrogated on other grounds by Deckard v. Bunch*, 358 Or. 754 (2016). In other words, negligence requires a finding that the defendant's conduct "unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff." *Fazzolari v. Portland Sch. Dist. No. 1J*, 303 Or. 1, 17 (1987).

Defendants argue that Relloque fails to prove causation, foreseeability, and unreasonableness.[7] The Court addresses each in turn.

### 1. Causation

Under Oregon law, "the plaintiff in a negligence action must . . . prove an actual causal link between the defendant's conduct and the plaintiff's harm—that is, the plaintiff must prove 'cause in fact.'" *Towe v. Sacagawea, Inc.*, 357 Or. 74, 87 (2015). Accordingly, "a plaintiff must establish that *but for* the negligence of the defendant, the plaintiff would not have suffered the

---

[7] Defendants further argue that Relloque does not allege a physical injury inflicted by Defendants, and thus he fails to state a claim for negligence. *See Paul v. Providence Health Sys.-Or.*, 351 Or. 587, 597 (2012) ("This court consistently has rejected claims for emotional distress damages caused by a defendant's negligence, in the absence of any physical injury."); *Hammond v. Cent. Lane Commc'ns Ctr.*, 312 Or. 17, 25 (1991) (negligent infliction of emotional distress ("NIED") case holding that "plaintiff may not recover for defendants' alleged negligence, because she sustained no physical injury"); *Philibert v. Kluser*, 360 Or. 698, 713 (2016) (NIED case where "[a]lthough the defendant may have contributed to the death by failing to respond quickly enough, the defendant did not cause the actual physical injury—the heart attack"). Defendants argue that they did not cause any of Relloque's physical injuries, as they all occurred before any alleged negligent act by Defendants. As discussed below, there is a genuine dispute of material fact as to whether Relloque suffered physical injuries after Defendants left.

Defendants also contend that intentional conduct does not give rise to a negligence claim. *See Kasnick v. Cooke*, 116 Or. App. 580 (1992) (involving battery); *Aranda v. City of McMinnville*, 942 F. Supp. 2d 1096 (D. Or. 2013) (same). Defendants raise this argument for the first time in their reply brief. The Court disregards this newly-raised argument. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief."); *Mitchell v. United States*, 971 F.3d 1081, 1084 n.4 (9th Cir. 2020) (affirming the district court's conclusion that an argument raised for the first time in a reply is waived). Moreover, a conscious choice may still give rise to a negligence claim.

harm that is the subject of the claim." *Hammel v. McCulloch*, 296 Or. App. 843, 851 (2019)

(emphasis in original) (quotation marks omitted). Questions of causation are "factual questions,

better answered by the trier of fact after hearing the evidence than decided as a matter of law by

a judge prior to trial." *Dahl v. Bayerische Motoren Werke (BMW)*, 304 Or. 558, 566 (1987) (en

banc). "A defendant whose negligent act is a cause of the plaintiff's injury is not necessarily

absolved of legal liability for that negligent act, merely because other, non-negligent conduct

was also a cause of the plaintiff's injury." *Box v. Dep't of Or. State Police*, 311 Or. App. 348,

369 (2021), *opinion adhered to as modified on reconsideration sub nom. Box v. State*, 313 Or.

App. 802 (2021).

Defendants contend that they are not responsible for Relloque's injuries, "as they were

undisputedly self-inflicted and fully realized before any City employee responded to the 911

call." *See* ECF 37-10 at 16 (Relloque Depo. 102:23-25) ("Q: And it's your impression or your

memory that at that time [you left Birdwell's bedroom], you had already been burned? A: Yes.").

Relloque responds that Birdwell described Relloque's burns as only on his hands, and did not

describe the extensive burns on his torso, hands, and arms that were present when he was found

and taken to the hospital.[8]

The Court cannot find as a matter of law that Relloque's injuries were fully realized when

Defendants arrived on the scene. Relloque's statement that he had already been burned when he

left Birdwell's bedroom means only that he had suffered *some* burns, not all his injuries,

---

[8] Relloque also argues that leaving a plaintiff alone in an intoxicated condition can be the basis for liability under a negligence claim, but the cases he cites in support of this proposition are inapposite because they involve the person who left the plaintiff in that position also *supplying* alcohol to that plaintiff. *See Ibach v. Jackson*, 148 Or. 92, 97 (1934), *cited with approval by Fulmer v. Timber Inn Rest. & Lounge, Inc.*, 330 Or. 413, 417 (2000), *superseded by statute on other grounds.*

PAGE 18 – OPINION AND ORDER

including the multiple missing fingernails. As Plaintiff notes, if the burns to his hands when Birdwell saw him were as severe as they had been when he was hospitalized, he likely would not have been able to use hair clippers. If Defendants had contacted Relloque and provided him with medical attention or taken him to a hospital, he likely would not have suffered any further injuries. Moreover, if Relloque had received medical treatment earlier, his injuries may have been less severe. Thus, construing all evidence in favor of Relloque—including that he had not yet suffered the full extent of his injuries when the Defendant Officers arrived—a reasonable factfinder could find that, but for Defendants' conduct in leaving the scene without providing Relloque with medical attention, Relloque might not have suffered some of his injuries.

### 2. Foreseeability

Defendants argue that Relloque's injuries were not reasonably foreseeable given the information known to Defendants at the time. Relloque responds that the harm he suffered was not only reasonably foreseeable but was actually foreseen by Defendants. In Goode's police report regarding the incident, he noted that the Defendant Officers

> felt very concerned [Relloque] was a danger to himself, could have a significant injury to his arm, and had possibly overdosed on mushrooms. . . . People under the influence of mushrooms can often be a danger to themselves or others due to their extremely unpredictable state and altered perception of reality.

ECF 43-15 at 14.

"Foreseeability . . . must be submitted to a jury, except in an extreme case a court can decide that no reasonable factfinder could find the risk foreseeable." *Jennewein v. MCIMetro Access Transmission Servs., LLC*, 308 Or. App. 396, 402 (2021) (cleaned up); *see also Cunningham v. Happy Palace, Inc.*, 157 Or. App. 334, 337 (1998), *superseded by statute on other grounds* ("A dispute in a negligence action about whether an injury was foreseeable generally presents an issue of fact and, therefore, is not a likely candidate for summary

judgment."). This is not the extreme case where the risk is obviously not foreseeable. As Relloque argues, the harm he suffered was *actually foreseen* by Defendants. Therefore, viewing all evidence in favor of Relloque, there exists a genuine dispute as to foreseeability.

### 3. Reasonableness

In determining whether an action or failure to act is reasonable, a court should consider "the likelihood of harm, the severity of the possible harm, the 'cost' of action that would prevent harm, and the defendant's position, including the defendant's relationship with the plaintiff." *Fuhrer v. Gearheart-By-the-Sea, Inc.*, 306 Or. 434, 439 (1988) (en banc). "Normally, negligence is a question of fact to be decided by the jury. The issue should be withdrawn from the jury only when the court can say that the actor's conduct *undoubtedly* falls either above or below the community's standard of reasonableness." *Thurman v. Thomas*, 70 Or. App. 159, 162 (1984) (emphasis added).

Defendants contend that they acted reasonably based on the information known to them at the time, from which they determined that Relloque's condition was not urgent. Defendants argue that they spent more than 60 minutes trying to contact Relloque and offer him assistance, and after failing to make contact, they made the reasonable decision that entering the house could cause more confrontation and damage than leaving Relloque to "ride out his high." Relloque responds that "[l]ike foreseeability, the reasonableness of a defendant's conduct should generally be determined by a factfinder, except in an 'extreme case.'" *Pickens v. United States*, 750 F. Supp. 2d 1243, 1257 (D. Or. 2010). Relloque argues that this is not an "extreme case," and that a reasonable juror could find that Defendants acted unreasonably.

In support, Relloque submits a declaration of Adam Bercovici, an "expert" on police use of force and police best practices. ECF 41. Mr. Bercovici has more than 40 years of service in law enforcement and investigations, including experience teaching field instruction courses to

police officers. *Id.* ¶¶ 1, 6. In his declaration, Mr. Bercovici expresses his opinion that "the officers acted unreasonably under the circumstances in not entering into the residence to check on a person known to be burnt because they had probable cause of a crime and were authorized to do so under their community care taking function." *Id.* ¶ 13. Defendants do not challenge Mr. Bercovici's expertise or argue that Mr. Bercovici is unqualified to offer this opinion, this opinion is not based on a reasonable understanding of the record, or Mr. Bercovici has not reliably applied the principles or methods to the facts here. Instead, Defendants only challenge Mr. Bercovici's conclusion. This creates a question of fact for the jury.

Relloque contends that Defendants knew about the risk of substantial harm to him because Birdwell requested medical help in her 911 call and reported seeing blood, smelling burned skin, and that Relloque was acting erratically. Relloque cites the Defendant Officers' actions of spending more than an hour trying to make contact with Relloque and Gradwahl returning to the residence a few hours later to argue that the Defendant Officers believed that Relloque faced a substantial risk of harm, and thus should have made contact with him. Relloque also submits the declaration of Dr. Baskerville, in which he opines that "the odor of burnt tissue should alert an emergency medical responder to the possibility of a severe burn . . . . Abandoning such a person to 'ride out their high' would fall below the community standard of care." ECF 42 ¶ 5.

Viewing this evidence in the light most favorable to Relloque, a reasonable juror could find that Defendants acted unreasonably. Thus, the Court denies summary judgment on Relloque's negligence claim.

**D. IIED**

Under Oregon law, a plaintiff asserting a claim for IIED must prove: "(1) the defendant intended to inflict severe emotional distress on the plaintiff, (2) the defendant's acts were the

cause of the plaintiff's severe emotional distress, and (3) the defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct." *McGanty v. Staudenraus*, 321 Or. 532, 543 (1995) (quotation marks omitted). A plaintiff sufficiently establishes intent by proving either that the defendant desired to inflict severe emotional distress, or that the defendant knew that such distress was certain, or substantially certain, to result from their conduct. *Id.* at 550-51 (adopting the definition of intent in the Restatement (Second) of Torts § 46 (1965)). For the defendant's acts to constitute an extraordinary transgression, the conduct alleged must be "outrageous in the extreme." *Watte v. Edgar Maeyens, Jr., M.D., P.C.*, 112 Or. App. 234, 239 (1992).

Defendants argue that they did not intend to inflict severe emotional distress, and that their conduct was not so outrageous as to constitute an "extraordinary transgression of the bounds of socially tolerable conduct." Relloque responds that Defendants knew that he was experiencing a behavioral health emergency and was a danger to himself, and thus they knew that severe emotional distress was certain or substantially certain to result from their conduct. Relloque further argues that, as police officers responding to a member of the public requesting aid, the Defendant Officers owed a greater obligation to Relloque, such that their behavior was sufficiently outrageous. *See Johns v. City of Eugene*, 2017 WL 663092, at *9 (D. Or. Feb. 15, 2017) ("[P]laintiff and defendants, as citizen and police officers, were in a 'special relationship'—an 'important factor' in determining whether the officers' conduct is extraordinarily transgressive." (quoting *McGanty*, 321 Or. at 545)). Defendants contend that Oregon precedent holds that law enforcement officials have "no special relationship to members

of the public in general," *Buchler v. State by & through Oregon Corrections Division*, 316 Or. 499, 505-06 (1993), but this case involved a custodian of a prisoner, not a police officer. [9]

Viewing this evidence in the light most favorable to Relloque and considering the Defendant Officers' status as police officers, Defendants' conduct is not sufficiently outrageous to support a claim for IIED. "A trial court plays a gatekeeper role in evaluating the viability of an IIED claim by assessing the allegedly tortious conduct to determine whether it goes beyond the farthest reaches of socially tolerable behavior and creates a jury question on liability." *House v. Hicks*, 218 Or. App. 348, 358 (2008). Defendants' conduct does not go beyond the bounds of socially tolerable conduct, and thus the Court grants Defendants' motion for summary judgment on this claim.

## CONCLUSION

The Court GRANTS IN PART AND DENIES IN PART Defendants' Motion for Summary Judgment, ECF 36. The Court grants Defendants' motion as to Relloque's claims under § 1983 and for IIED. The Court denies Defendants' motion as to Relloque's claim for negligence.

**IT IS SO ORDERED.**

DATED this 26th day of March, 2025.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge

---

[9] Relloque also contends that "[i]ntentionally causing another person severe emotional distress by exposing that person to a threat of imminent physical harm is, or may be, outside the bounds of socially tolerable behavior," such that summary judgment should be denied. *Babick v. Or. Arena Corp.*, 333 Or. 401, 413 (2002). In *Babick*, the plaintiffs alleged that the defendant released "intoxicated and violent concertgoers who previously had been detained by plaintiffs." *Id.* (cleaned up). This involves an affirmative action by the defendants that put the plaintiffs at risk of a harm that they did not previously face, and is thus distinguishable from this case, where the Defendant Officers did not put Relloque in a worse position, as discussed in Section B.1.