Beth Creighton, OSB #972440
E-mail: *Beth@civilrightspdx.com*
Kristin R. Bell, OSB #235024
E-mail: *Kristin@civilrightspdx.com*
CREIGHTON & ROSE, PC
735 SW First Ave., Ste. 300
Portland, Oregon 97204
Phone: (503) 221-1792
Fax: (503) 223-1516
Of Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

**MICHAEL AUSTIN RELLOQUE, IV**,

Plaintiff,

vs.

**CITY OF WEST LINN, MATTHEW GOODE, DANA GUNNARSON, TODD GRADWAHL,**

Defendants.

Case No. 3:22-cv-01781-SI

**PLAINTIFF'S EXPERT DISCLOSURE FOR ADAM BERCOVICI**

Attached hereto is Plaintiff's expert disclosure for Rule of Civil Procedure (26)(a)(2) by

Adam Bercovici Titan National Consulting Group, LLC, as Exhibit 1. Also attached as Exhibit

2, 3 and 4 is the Biography, Curriculum Vitae and Testimonies, Fee Agreement and Invoices

for Expert Disclosures.

CREIGHTON
& ROSE, PC | ATTORNEYS
AT LAW

735 SW First Ave., #300
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

PAGE 1 – PLTF'S EXPERT DISCLOSURE FOR ADAM BERCOVICI

DATED this 30th day of June, 2025.

CREIGHTON & ROSE, PC

*s/Beth Creighton*
BETH CREIGHTON, OSB #972440
*Beth@civilrightspdx.com*
KRISTIN R. BELL, OSB #235024
*Kristin@civilrightspdx.com*
735 SW First Ave., Suite 300
Portland, OR 97204
Tel: 503.221.1792
Attorney for Plaintiff

CREIGHTON
& ROSE, PC

ATTORNEYS
AT LAW

735 SW First Ave., #300
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

PAGE 2 – PLTF'S EXPERT DISCLOSURE FOR ADAM BERCOVICI

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION


MICHAEL AUSTIN RELLOQUE

      Plaintiffs,


CITY OF WEST LINN, MATHEW
GOODE, DANA GUNNARSON, TODD
GRADWAHL,

      Defendants.

Case No. 3:22-cv-01781


In compliance with the Rule of Civil Procedure (26(a)(2), I hereby certify that this report is a complete and accurate statement of all my opinions set forth to a reasonable degree of probability and the basis and reasons for them, to which I will testify under oath.


Submitted by:

Mr. Adam Bercovici

Titan National Consulting Group, LLC

Bend, Oregon


## I.     INTRODUCTION

I am the Chief Executive Officer and Group Coordinator of Titan National Consulting Group, a professional consulting and expert witness company based in Bend, Oregon. As a law enforcement expert witness, I provide policy reviews, evidence-based evaluations, and expert opinions about police practices, security protocols, and public safety performance. The opinions stated in this report are based on information available as of the date of this report. I have reviewed the materials described in Exhibit A. If any new evidence is provided, I reserve the right to supplement or modify my opinions to reflect that evidence.

EXHIBIT 1

Page 1 of 26

If the Defendants submit any response to my expert report, I reserve the right to respond to any issues raised by those responses.

## II. RETENTION/ ASSIGNMENT

On July 18, 2024, I was retained by Beth Creighton of the law officers of Creighton and Rose, PC, Portland, Oregon, in the matter of Mathew Austin Relloque v The City of West Linn, Oregon, and West Linn Officers, Mathew Goode, Dana Gunnarson, and West Linn Police Sergeant Todd Gradwahl. I was asked to review the circumstances of a police response to a call of an individual who was in a mental health crisis in the city of West Linn, Oregon. I was asked to review the case materials, write a Rule 26 Report, and provide opinions on the officer's standard of care in responding to this call for service, specifically that the officers and supervisor assigned to this call failed to investigate the condition of Michael Relloque, despite information that Relloque presented a danger to himself and/ or others. In addition, the West Linn officers and supervisor had sufficient probable cause to contact Relloque and ensure that he was placed in a position where he could not harm himself or any member of the community. I was also asked to opine on the officer's failure to act in terms of foreseeability, that the officer's and supervisor's failure to act allowed an injured Relloque, who was psychologically compromised, to leave his home on his own without being provided with the proper care. I was also asked to offer opinions on the supervisor's failure to accurately provide his commanding officer with a complete and accurate overview of the substance of the call and the steps taken or not taken by the officers and supervisor on scene. The discovery I reviewed is listed under Exhibit A of this report.

## III. BACKGROUND

With an extensive background in public safety, I bring a comprehensive understanding of police practices and operations to this analysis. My extensive background, which includes a career spanning 30 years as a police officer, sergeant, and lieutenant for the Los Angeles Police Department (LAPD), provides me with a unique and in-depth perspective on this subject. In 2012, I retired from the LAPD as the Officer-in-Charge of the Homicide Special Section, Robbery Homicide Division. I was, for a period in 2011, the Acting Commanding Officer of the Robbery-Homicide Division.

EXHIBIT 1
Page 2 of 26

I have led policy development groups and have authored policies for my agency.

During my 30-year career, I held the following positions.

- Patrol Officer I - Academy - Foothill Area (1982-1984)
- Police Officer II - Wilshire Area (1984)
- Police Officer II - Operations West Bureau CRASH (1984-1985)
- Police Officer III-Training Officer - Wilshire Area (1985-1987)
- Element Member & K9 Handler - Metropolitan Division (1987-1993)
- Sergeant-77th Street (1993-1994)
- Sergeant II-Vice Supervisor - W.L.A. Area
- Sergeant II - Watch Commander - Van Nuys Area (1996-1998)
- Sergeant II - Associate Advocate - Internal Affairs Division (1998-1999)
- Lieutenant I - Watch Commander - North Hollywood Area (1999-2000)
- Lieutenant I Mobile Field Force Leader, Operations Valley Bureau ( 2000)
- Lieutenant II - Burglary-Auto Theft Division & Officer-in-Charge of the Interstate Theft Task Force (2000-2001)
- Lieutenant II - F.B.I. Violent Crime Task Force & Officer-in-Charge of Los Angeles- Joint Terrorism Task Force (2001-2003)
- Lieutenant II - Officer-in-Charge of Special Investigation Section, Major Crimes Division, Robbery-Homicide Division (2003-2011)
- Lieutenant II - Officer-in-Charge of Homicide Special Section, Robbery-Homicide Division (2011-2012)

As a Police Officer I, II, and III, I was assigned to a specific car in my division of assignment. In these assignments, I regularly responded to significant incidents where individuals were in a mental health crisis. This was actually one of the more frequent types of calls that I responded to as a police officer. Over these first five years, I handled dozens of calls where individuals were in a mental health crisis. I became well-versed in de-escalation

EXHIBIT 1
Page 3 of 26

methods and my agency's policy as it applied to people in a mental health crisis.

These incidents included individuals who were under the influence of drugs or alcohol, where substance abuse was the ignition factor in the mental health crisis. In each of these cases, I learned to provide the proper standard of care and ensure that those individuals were provided with the resources they needed. What I also learned during those formative years was that it was the duty of a police officer to use every available means to resolve a situation and that driving away was not an option. During this period in my career, I was also promoted to the position of Training Officer or Police Officer 3. In that role, I trained probationary officers in all areas of police work, including responding to calls for service when someone was in a mental health crisis.

In 1987, I was selected to become an Element member of the Metropolitan Division, an elite division within the LAPD. At the time, the Metropolitan Division consisted of five platoons: B, C, and D (SWAT), K9, and the Mounted Unit. As part of my assignment to this division, I received advanced training in dealing with people in a mental health crisis. In 1988, I successfully negotiated an incident where a person was holding a gun to his head, threatening suicide. After a three-hour negotiation, I was able to get the individual to put down the weapon and surrender to the police.

In 1989, I was selected to join the LAPD Metropolitan Division K9 Platoon. I worked as a K9 handler until 1993 when I was promoted to sergeant.

As a field sergeant-front line supervisor, I had direct oversight over officers responding to calls where a mental health crisis was the source of the call. As a field sergeant, I provided on-scene supervision and regular training for my subordinate officers in the most current and up-to-date methods for handling mental health crises. One of the critical lessons I learned as a supervisor was to provide my officers with the proper direction and guidance. As a front-line supervisor, I needed to be knowledgeable, honest, and ethical in my interactions with the public and my agency. My job was to direct, supervise, and, most importantly, ensure that the correct course of action was taken. As a supervisor, I could not allow a fear of conflict or hard work to influence my decisions. In my role as supervisor, it was my duty and obligation to ensure that there were no policy violations and that my officers met the proper standard of care when dealing with citizens in a mental health crisis.

EXHIBIT 1
Page 4 of 26

This oversight was significant in incidents where individuals were in a mental health crisis. I also received and offered regular training to my officers in using force, including instruction and scenario-based training in handling mental health/medical aid crisis calls for service. This training included formal instruction at roll calls, training days, and discussions on current case law and policy. This training was regularly applied on calls for service. After the call was completed, I completed a debrief of the incident and formal documentation.

In 1996, I was promoted to Sergeant II Watch Commander and assigned to the Van Nuys Area. In that role, I was responsible for up to seventy-five officers and ten supervisors each shift. During off-hours, I commanded the entire station and was responsible for all significant incidents in the division.

As a Watch Commander, I responded to major incidents as Incident Commander and established all operational protocols. Frequently, these incidents involved complex use of force incidents. I ensured that my officers received the necessary departmental training and formalized area training at roll call. We regularly discussed scenarios and methods to resolve those incidents where non-compliant suspects were safely – taken into custody without the need to use force. Because the role of the Watch Commander was all-encompassing, I was tasked with training and evaluating subordinate officers and supervisors in their tactical responses to calls, using less-lethal tools, de-escalation, use of force policy, and deadly force. The training was conducted daily, and I regularly provided formal follow-ups to ensure the information was adequately retained. I also completed regular scenario-based training where each officer's tactical thought process could be adequately evaluated. If the officer or subordinate supervisor were deficient in their performance, I would conduct remediation and, if necessary, initial discipline and risk assessment protocol.

As Sergeant II Watch Commander, I was also tasked with investigating and supervising personnel complaints, both internally and externally generated. In that role, my subordinate supervisors achieved a level of competence in handling internal complaints. That included subject and witness interview methods, question formulation, and evidence collection.

As a Sergeant II Watch Commander, I also adjudicated complaints through the letter of transmittal process. In this process, I reviewed the facts and issues of personnel complaints, identified policy, criminal, and procedural violations, and made recommendations for

EXHIBIT 1
Page 5 of 26

discipline up to and including termination of employment. Frequently, these matters involved the improper use of force and neglect of duty.

As a result of my performance as Sergeant II Watch Commander In 1998, I was assigned to the Internal Affairs Division as an Advocate, where I presented disciplinary cases to Police Boards of Rights. The Board of Rights is based on the Uniform Code of Military Justice and is similar in form and function to a court-martial. This position was a highly coveted and selected assignment where I presented discipline cases of only the most significant nature. In that assignment, I presented several cases involving neglect of duty by officers and supervisors.

In 1999, I was promoted to lieutenant. I assumed the position of Watch Commander in the North Hollywood Area, where my duties were similar to my assignment at Van Nuys but in a higher civil service and managerial role. On many nights, I was the sole management representative in the Operations Valley Bureau and occasionally the entire city. I responded to and assumed command of significant incidents, including many that involved mental health crises. I also responded to many officer-involved shootings and complex use of force incidents, where I managed the incident and notified the appropriate investigative entities. As a Lieutenant Watch Commander, I was also responsible for training my subordinates in a myriad of operational duties, including calls for service involving armed suspects, tactical responses, and consideration. I conducted updated training, including case law and department policy, as it applied to the use of force.

From 2000 to 2003, I was the Officer-in-Charge of two federal task forces, the Interstate Theft Task Force and the Violent Crime Task Force, Los Angeles. As the Officer-in-Charge of the Violent Crime Task Force, I supervised personnel from the Los Angeles County Sheriff's Department, the Federal Bureau of Investigation, Alcohol Tobacco and Firearms, and the LAPD.

In 2003, I assumed leadership of the famed Special Investigation Section, an investigative, surveillance, and apprehension team that oversees investigations only of major felony crimes. The Special Investigation Section is a tactical unit that uses a variety of advanced weaponry. After a series of controversial incidents involving S.I.S., I was directly placed in command of S.I.S. by the Chief of Police. My orders were to affect cultural, tactical, and structural change, or the unit would be permanently disbanded. I was to be the agent of

EXHIBIT 1
Page 6 of 26

change in a storied and legendary team. It should be noted that this was unprecedented in the Department's history and was based on my prior leadership success at the Violent Crime Task Force Los Angeles. The prior Officer-in-Charge was relieved of his command, and I was given full autonomy to address personnel issues, restructure the internal leadership of the unit, and re-create training protocol and the selection process. As a result, I developed a comprehensive selection process where candidates were vetted and selected based on their knowledge of the use of force policies and related current legal decisions. With newly appointed internal trainers in place, the training protocol was re-written to emphasize adherence to the current use of force policy. As a result of my leadership, the use of force by S.I.S. personnel was greatly reduced. It has been widely recognized that my leadership and the hard decisions I made were directly responsible for the survival of the Special Investigation Section.

When I assumed command of S.I.S., the unit was plagued with negative socialization issues, which had been in play for decades. Groups within the section believed that they could control management and were resistant to change. These types of internal problems had contributed to shootings that the Police Executives and the Commission were questioning. My orders were to create balance and restructure and, when necessary, remove and reassign any individuals who were resistant to the positive change that was being fostered.

In 2011, I was assigned to the Robbery-Homicide Division Homicide Special Section as the Officer-in-Charge. In that capacity, I managed specialized homicide detectives and oversaw some of the most high-profile homicide cases in Los Angeles. The Homicide Special Section was also the primary criminal investigative component for all categorical uses of force (baton head strikes, use of upper body control holds-choke holds), including officer-involved shootings and incidents where there was an in-custody death. As the Officer-in-Charge, I managed and supervised these investigations to determine if there was criminal culpability on the officer's part. During this time, I also did several rotations as the Acting Commanding Officer of the Robbery-Homicide Division.

**IV.**

EXHIBIT 1
Page 7 of 26

**V.      QUALIFICATIONS AND EXPERIENCE FOR REVIEWING THIS CASE**

To support my expertise, during my three decades in policing, I have served in many facets of law enforcement. From patrol operations to internal investigations, area management, and police administration, I have developed my skills by reviewing critical incidents and evaluating circumstances. Additionally, I have fulfilled crucial responsibilities in evaluating and developing policy.

During my three-decade career, I held the following California POST (Commission on Peace Officer Standards and Training) certificates: Basic, Intermediate, Advanced, Supervisory, and Management. In addition, during the last eleven years of my career as a lieutenant, I held a Department of Justice (FBI) Top Secret/SCI (TS- SCI) security clearance.

Over the past eight years, I have testified as an expert in both state and federal court. I have authored multiple Rule 26 Reports ranging in case topics from Excessive Use of Force, Use of Lethal Force, Crisis Intervention, Crowd Management, Wrongful Conviction and Security accepted practices. A list of my most recent cases will be listed as Exhibit B of this report.

**VI.      OPINION STANDARD/DEGREE OF CERTAINTY**

The opinions expressed herein are to a reasonable degree of scientific certainty and/or to a reasonable degree of professional certainty.

**VII.    METHODOLOGY**

The opinions expressed in this report are based on an analysis of the case-specific information provided, using methodologies and policy standards widely accepted in police practice and critical incident review. Any cited resources support these methodologies.

In evaluating the facts of this case, I utilized qualitative and quantitative content analysis and a case study research method because this incident was bound by time, location, and specific events. I focused on understanding the participants' perspectives and experiences.

EXHIBIT 1
Page 8 of 26

I used qualitative and quantitative content analysis alongside my specialized knowledge, skills, education, experience, and training. I also reviewed the undisputed reports and depositions to form my opinions.

I conducted a document review as it provides an effective means to obtain background, context, and corroborate evidence from other sources.

I utilized a literature review process that included rules, policies, customs, laws, and relevant policy decisions.

## V.    METHODS

I formed my opinions by reviewing case-specific materials, relying on my extensive experience in law enforcement, and adhering to consensus-based police practices, procedures, and typically accepted standards. Law enforcement operations nationwide are guided by relevant case law, certain official opinions, regulations, customs, practices, and generally accepted law enforcement practices. In forming my opinion, I considered all the police reports, facts, and data I examined and reviewed during my evaluation, along with my knowledge, skill, experience, education, and training obtained during my 30-year career in law enforcement.

## VI.    SUMMARY OF EVENTS

On November 14, 2020, shortly after midnight, the West Linn Police Department received a call for service through dispatch and emergency services from Milessa Birdwell, who stated that her roommate Michael Relloque was behaving erratically, had blood and or burns on his arm, was covered in ash and smelled like burnt skin. It should be noted that Birdwell was the primary tenant and that she rented a room in the residence to Relloque. She further advised dispatch that Relloque had kicked in her locked door, entered her room naked, advanced toward her, and climbed into her bed. In order to protect herself, she armed herself with scissors and yelled at Relloque to leave. Part of Birdwell's actual statements to 911 were "My roommate flipped out he came into my room, he burnt himself., so maybe I think he needs medical.[1]

---

[1] Baters 324 11-14-20 LP20047673 00:36-00:50

EXHIBIT 1
Page 9 of 26

West Linn Police Officers Goode, Gunnarson, and Sergeant Gradwahl responded to the call for a Behavioral Health Incident at 19856 White Cloud Circle in West Linn. In addition to the response of police, American Medical Response (AMR) and Tualatin Valley Fire and Rescue (TV&R) were also dispatched to the scene. AMR and TV&R staged down the street and waited for the officers to respond.

When the officers arrived on the scene, they were met by Birdwell, who stated that Relloque had stood at the top of the stairs of the residence naked, screaming, "I am God." She further advised officers that Relloque had ash and blood on his hands and that she could smell burnt skin. Birdwell further stated that Relloque had kicked in her bedroom door, which caused her to arm herself with a pair of scissors. Birdwell told Relloque to stop. According to Birdwell, Relloque stated, "I will, I will' and then got into her bed.

The officers, after speaking with Birdwell, formed the opinion that Relloque was possibly under the influence of hallucinogenic mushrooms. At this point, the officers had sufficient information to enter the residence and assist Relloque. Their first course of action was to call Relloque's cell phone. Relloque did not answer. There is some dispute as to whether this occurred since there is no evidence of calls to Relloque's cell phone at the time in question from the West Linn Police Department. A review of those phone records does not show that Relloque received any calls during the time period in question.[2] The officers then checked the residence's exterior but did not make entry. Unable to decide what to do, Gradwahl, the on-scene supervisor, called his Captain, Oddis Rollins, who was at home. Gradwahl then misrepresented the events to Rollins, stating that a crime had not occurred, which was not supported by evidence. The information that Birdwell had provided to the officers and Gradwhl. Relloque met the elements of Menacing as defined by the Oregon Revised Statutes.[3] Gradwahl then chose to omit the fact that Relloque was injured and that the smell of burning flesh permeated the residence. Gradwahl then stated that it was his belief that it was in the best governmental interest not to enter the location and make contact with Relloque. He stated that he had advised Birdwell to leave while Relloque cooled off. Based on this incorrect information, Rollins agreed with Gradwahl's

[2] Bates 319-323
[3] ORS 163.190 A person commits the crime of menacing if by word or conduct the person intentionally attempts to place another person in fear of imminent serious physical injury.

EXHIBIT 1
Page 10 of 26

decision. Gradwahl then advised Melissa Birdwell that the officers did not want to enter the residence for fear that a use of force might occur. This decision was not part of the information relayed to Rollins. The officers did not ask Birdwell if they had permission to enter the residence. The officers, who had been on the scene for fifty-three minutes, left without a resolution to the call. They told Birdwell to leave her home and allow Relloque to calm down.

At approximately 6:30 in the morning, Relloque was found disorientated in Turner, Oregon, at the Turnaround Café, approximately 49 miles from West Linn. Relloque was burned over 30% of his body and had several fingers missing. He was transported to Legacy Emmanual's Burn Center. Later that same morning, Melissa Birdwell returned home and found Relloque's hair, burnt human flesh, and one of his fingers in the toilet.

## V. OPINIONS

NOTE: This report and my anticipated testimony are intended to provide fair, objective and non-partisan opinion evidence. My opinions are intended to inform the court and assist the court as reasonably required and support and respect the jury's purview and responsibility to determine the matter at issue.

**Opinion 1.**

**Officers Goode, Gunnarson, and Sergeant Gradwahl were negligent when they failed to use all means legally available to them to ensure that the Relloque was not injured. They failed to act even though they had sufficient information, based on Birdwell's statement, that Relloque was in a mental health crisis and needed police and medical intervention. Officers Goode, Gunnarson and Gradwahl failed to provide Relloque with an accepted standard of care.**

When officers Goode, Gunnarson, and Sergeant Gradwahl (the officers) arrived on the scene, they were immediately presented with information by Melissa Birdwell (Birdwell) that Relloque was in both a mental health crisis and a medical crisis. Birdwell told the officers that Relloque had woken her up, entered the room and was behaving erratically. She further stated he had injured his hands. Birdwell told the officers that Relloque hands were black as though they had been put in a fire, that she smelled something burning, and that there was a

EXHIBIT 1
Page 11 of 26

fireplace in the residence.[4] Here, the officers are almost immediately presented with information that Relloque, who was inside a home, was having a type of mental health crisis ( whether it was caused by mushroom ingestion or not is at this point not important, he was in a mental health crisis) and that he is injured, likely by fire.

The policy of the West Linn Department Operations Manual states the following: **It is the policy of the West Linn Police Department that all officers and other designated members be trained to provide emergency medical aid and to facilitate an emergency medical response.[5]** It is my opinion, based on my 30 years in law enforcement, where I responded to hundreds of similar calls, both as a police officer, supervisor and later as a lieutenant, that the reasonable response at this point would have been to investigate further and ascertain Relloque's location inside the residence and provide a proper standard of care. Not only to ascertain his safety but to ensure that the community was not in any danger since Birdwell's statement indicated Relloque was using the fireplace to injure himself. Based on the officers' information, it was reasonable to assume that Relloque's behavior with the fire posed a danger to the public. Further injuries to Relloque and or members of the community were foreseeable. Not addressing the issue of foreseeability in my opinion fell below the standard of care.

The IACP (International Association of Chiefs of Police) identifies some of the key components when assessing risk in persons in a mental health crisis, and for the purposes of this report Relloque was in a mental health crisis, even though it was possibly caused by the ingestion of mushrooms: The risk assessment are as follows:

**Assessing Risk 1. Most PIC (Persons In Crisis) are not violent, and some may present dangerous behavior only under certain circumstances or conditions. Officers may use several indicators to assess whether a PIC represents a potential danger to themselves, the officer, or others. These include the following:**

**a. The availability of any weapons.**

---

[4] Birdwell Deposition page 32:4-15
[5] WLPD Manual 468.2

EXHIBIT 1
Page 12 of 26

**b. Threats of harm to self or others or statements by the person that suggest that they are prepared to commit a violent or dangerous act. Such comments may range from subtle innuendo to direct threats that, when taken in conjunction with other information, paint a more complete picture of the potential for violence.**

**c. A personal history that reflects prior violence under similar or related circumstances. The person's history may already be known to the officer, or family, friends, or neighbors might provide such information.**

**d. The amount of self-control that the person exhibits, particularly the amount of physical control, over emotions such as rage, anger, fright, or agitation. Signs of a lack of self-control include extreme agitation, inability to sit still or communicate effectively wide eyes, and rambling thoughts and speech. Clutching oneself or other objects to maintain control, begging to be left alone, or offering frantic assurances that one is all right may also suggest that the individual is close to losing control.**

**e. Indications of substance use, as these may alter the individual's self-control and negatively influence an officer's capacity to effectively use de-escalation strategies.**

**f. The volatility of the environment. Agitators that may affect the person or create a particularly combustible environment or incite violence should be taken into account and mitigated. For example, the mere presence of a law enforcement vehicle, an officer in uniform, and/or a weapon may be seen as a threat to a PIC and has the potential to escalate a situation. Standard law enforcement tactics may need to be modified to accommodate the situation when responding to a PIC.**

**g. Aggressive behaviors such as advancing on or toward an officer, refusal to follow directions or commands combined with physical posturing, and verbal or nonverbal threats.**

**2. Failure to exhibit violent or dangerous behavior prior to the arrival of the officer does not guarantee that there is no danger.**

EXHIBIT 1
Page 13 of 26

**3. A PIC may rapidly change their presentation from calm and responsive to physically active. This change in behavior may come from an external trigger (such as an officer stating "I have to handcuff you now") or from internal stimuli (delusions or hallucinations). A variation in the person's physical presentation does not necessarily mean they will become violent or threatening, but officers should be prepared at all times for a rapid change in behavior.**

**4. Context is crucial in the accurate assessment of behavior. Officers should take into account the totality of circumstances requiring their presence and overall need for intervention.[6]**

The officers, in this case, did not make a proper assessment as identified by the IACP, an organization that develops standards in American Law Enforcement. Based on my review of the discovery materials provided, I believe that the officers, under the direction of the on-scene supervisor, chose to view the incident only from the risk management lens and as a result did not provide Relloque with a generally accepted standard of care. The officers failed to do the following:

- Birdwell told the officers that Relloque had been harming himself with the fire from the fireplace. She told them that Relloque's hands were burned, and yet that information did not influence their decision-making. This assessment failure fell below the accepted standard of care.
- Based on the evidence I reviewed, there is no indication that the officers ever asked Birdwell if he (Relloque) had exhibited this behavior on prior occasions. This in my opinion fell below the acceptable standard of care.
- Birdwell gave the officers information that Relloque lacked self-control, that he had no control over his emotions, and that he was highly agitated. He was also having religious ideation. Not including this information in their decision-making fell below the acceptable standard of care.
- The officers were given information that Relloque had taken mushrooms and that his behavior was a result of his ingestion of that substance. While there was compelling

[6] IACP Responding to Persons Experiencing a Mental Health Crisis August 2018

EXHIBIT 1
Page 14 of 26

evidence that his use of mushrooms was the reason for his behavior, no assessment was made as to how to deal with that fact. This lack of proper and informed assessment in my opinion fell below the acceptable standard of care.

- The officers chose not to intervene even though there was sufficient information that Relloque was a danger to himself and the community. Their decision not to intervene in my opinion fell below the acceptable standard of care.

- Officer Gunnarson stated in her deposition that she had CIT (Crisis Incident Training) experience as it applied to mushrooms. She chose not to utilize that training.[7] By not utilizing her training Gunnarson failed to provide Relloque with the proper standard of care.

- The officers allowed Relloque to remain in the residence and have access to the source of his injury. This failure fell below the acceptable standard of care.

Instead of following established agency guidelines and nationally accepted standards, the officers did the following;

- They never summoned medical care for  Relloque, nor did they have Birdwell speak with anyone from AMR or Tualatin Fire and Emergency Response to make a pre-assessment.[8]

- They never asked Birdwell if they could enter the residence, even though she had primary control and was the person on the lease.[9]

- Birdwell said they never called Relloque to see if he would answer.[10]

- What they told Birdwell was that based on the state of police relations at the time, they did not want to contact Relloque for fear of a use of force.[11]

In his deposition, the supervisor, Todd Gradwahl, confirms the information Birdwell gave him. Gradwahl stated that the Relloque had kicked down the door, that he had yelled that he was God, and that he had burned himself. Gradwahl stated that Birdwell told him that she smelled burnt skin.[12] In my opinion, Gradwahl had enough information to check on Relloque's welfare under the community caretaking function.

[7] Gunnarson deposition page 52:1-15
[8] Birdwell deposition page 56
[9] Birdwell deposition page 57
[10] Birdwell deposition page 61
[11] Birdwell deposition page 37
[12] Gradwahl deposition page 48:11-25

EXHIBIT 1
Page 15 of 26

In his deposition, Officer Goode stated that Gradwahl had taken over all of the major decision-making on the call.[13] These decisions were Gradwahl's at this point.

The mission statement of the West Linn Police Department states: ***The Mission of the West Linn Police Department is to protect and serve the community of West Linn professionally and compassionately. We are committed to earning trust and increasing our accountability through transparent policies and unbiased practices.*** I believe this standard was not met under Sergeant Gradwahl's supervision. It is my opinion that Sergeant Gradwahl used multiple methods to avoid providing an acceptable standard of care for Relloque. Gradwahl should have been aware that, based on the information given to him that Relloque, committed the crime of menacing as defined in ORS 163.190. It is my opinion that the information in itself was enough to go into the residence. Gradwell never asked Birdwell what the tenant-roommate relationship was. His deposition statement that the governmental interest was not there to go in that house at that point [14]is not only not supported by evidence but is disingenuous. Gradwahl, while new to West Linn as a supervisor, was not new to law enforcement, with over twenty-six years of experience with the Portland Police Bureau as a detective. Gradwahl knew that he had sufficient information to make contact with Relloque. It is my opinion that Gradwahl knew that he had evidence of a crime. From his deposition, he confirmed this. *Q. And* you didn't have any information that he was being violent with Mellissa Birdwell, correct? *A. No I don't believe that's correct. I think when someone screams and comes down your stairs and kicks your door open, I think that's an act[15].* Gradwahl admits that he had a crime and an overt act. Evidence of a crime was enough information to allow him to enter the residence. Gradwahl knew that he was obligated to check on Relloque's welfare and had sufficient information to do so. It is my opinion that Gradwahl used every available means **not to do** his job. In addition, by taking over the call, Gradwhal compromised Gunnarson and Goode. Gradwahl, through the decisions he made, did not provide Relloque with an acceptable standard of care. Gradwahl's reasoning that he was not going to gamble getting into a use of force with a person who had possibly committed a crime and was also in need of medical help because he was concerned about the potential for a use of force is not reasonable, nor is it professional, a quality that is outlined in

[13] Goode deposition page 73 and 75
[14] Gradwahl deposition page 96
[15] Granwahl deposition page 105

EXHIBIT 1
Page 16 of 26

the Mission Statement of the West Linn Police Department. Gradwahl and his officers did not provide Relloque with an acceptable standard of care and failed to provide service, transparency, accountability, integrity, and respect. The reasons are as follows:

- Service: they did not provide Melissa Birdwell with either service or compassion when they failed to address why she had called the police. The officers' answer in this case was to neglect their duties because they feared a possible use of force.
- They failed to provide medical care for Relloque, when the call's origin was a request for medical care.
- Transparency: This goes to Gradwahl, who was not honest when he called and sought advice and/or confirmation from his captain, Oddis Rollins. This factor will be covered in the next section of this report.
- Integrity: In my opinion, the officers did not do their job. They ran away from their duties, and in doing so, they sacrificed their integrity.
- Respect: The officers failed in their duties. In neglecting their duties as sworn law enforcement officers, they failed to respect Mellissa Birdwell, Michael Relloque, and the community they were sworn to protect.

Gradwahl, Gunnarson and Goode were experienced law enforcement officers. They should have been able to foresee that by walking away from this call and not proactively checking on the wellbeing of Relloque, they endangered not just him but the community as well. This was proven to be true when Relloque was found forty-nine miles away from West Linn later that morning, in Turner, Oregon, injured and burned over 30% of his body. All indications were that he had driven himself to Turner in a compromised medical and mental state.[16] It is my opinion that this occurred because Gradwahl, Gunnarson, and Goode neglected their sworn duty.

In his report Goode states that "*We came to the consensus that due to Relloque's unpredictable nature, the absence of a crime and the lack of knowledge that Relloque was an immediate danger to himself, the governmental interest was not high enough to the private residence absent additional information.*[17]" This statement by Goode does not reflect the evidence that I reviewed. Birdwell's statement to the officers indicated that Relloque was in a mental health crisis and that he needed help. The elements of the crime of Menacing did exist,

[16] DEF0203-0210
[17] DEF1382

EXHIBIT 1
Page 17 of 26

and it was clear that Relloque was an immediate danger to himself and the community. Failing to act on this information, in my opinion, fell below the standard care that the officers should have given Relloque.

It is my opinion that you cannot avoid your obligation as a police officer because you are afraid of conflict. Throughout his deposition, Gradwahl mentions de-escalation training as though he is trying to compare his neglect of duty to an act of de-escalation. Based on my three decades of experience as a law enforcement officer, the actions of Gradwahl, Gunnarson and Goode were not in the best interests of the community they served and, most notably, in the interests of Relloque, who almost did not survive his injuries. It is my opinion that Officers Goode, Gunnarson and Sergeant Gradwahl committed serious misconduct, and their actions fell below the standard of care.

**Opinion 2**
**Gradwahl, in his attempt to justify his actions, did not provide reliable information to his direct supervisor, Captain Oddis Rollins**

While he was at the incident, Gradwahl decided to contact his direct supervisor, Captain Oddis Rollins, wake him up, and get his approval or buy-off for the course of action he was about to take.

In his deposition, Rollins confirmed that Gradwahl failed to tell his direct supervisor the following critical facts of the call:

1. Gradwahl did not disclose that he had not asked Birdwell for permission to enter the residence. This was a critical piece of information because her permission would have allowed the officers to check Relloque's condition. Rollins, in his deposition, agreed that asking the roommate for permission to enter would have been a reasonable step to take. [18]

2. Gradwahl never told Rollins that the roommate believed Relloque had burns on his arm. Gradwahl did not report that she (Birdwell) thought she saw blood on Relloque.[19] This, in my opinion, would have been a critical piece of information to provide to your supervisor.

[18] Rollins Deposition page 15: 23-25 and 16:1-2 Q. Okay. Would it have been something reasonable to do to request of the roommate if they could go into the residence ? A. Absolutely.
[19] Rollins Deposition page 16:13-17

EXHIBIT 1
Page 18 of 26

3. Gradwahl never mentioned to Rollins his concerns about the lack of governmental interest.[20]
4. Gradwahl never mentioned to Rollins that a crime had been committed.

In my own experience as a lieutenant assigned to the LAPD Robbery-Homicide division, I was part of a rotation of senior management that was on call to provide supervisory oversight city-wide during off hours. While it was incumbent on me to provide proper guidance, it was also the responsibility of the sergeant in the field to be honest and transparent when providing me with the correct information. That meant not leave anything out.

It is my opinion that Gradwahl omitted critical information when he called Rollins to justify his decision to walk away from the call. These omissions, in my opinion, fell under neglect of duty and were below an acceptable standard of care.

In his official supplemental report, Gradwahl was not forthcoming in his statement that he and the officers had exhausted practical means of contacting Relloque. Based on my review of the evidence, I believe they still had other options to exhaust but chose to leave the call unresolved. Not using exhaustive measures fell below an acceptable standard of care. [21] This statement in a police report is not supported by the evidence I reviewed, including Birdwell and Rollins's depositions, where their accounts differ from what Gradwahl wrote. In the same report, Gradwahl again stated that he told Rollins that he did not feel it was in the best governmental interest to enter the location to make contact with Relloque.[22] As stated before, Rollins did not remember having that conversation with Gradwahl. I believe Gradwahl committed serious misconduct when he documented something that did not occur in an official report.

Based on my review of DEF1344 through 1349, I also believe that Gradwahl changed Goode's report to fit the narrative that he had told his Captain, Oddis Rollins. Sergeant Gradwahl's insistence on adjusting what occurred during this incident is misconduct. In my experience investigating, presenting, and adjudicating internal complaints, Sergeant Gradwahl's actions were a breach of trust to the community he was sworn to protect and serve.

In my experience working in LAPD Internal Affairs and later as a lieutenant, where I adjudicated serious misconduct, Gradwahl's actions fall under the category of false and

[20] Rollins Deposition page 21:5-8
[21] DEF0078
[22] DEF0078

EXHIBIT 1
Page 19 of 26

misleading statements, which, in my opinion, would not make him suitable for work as a law enforcement officer. It is also my opinion that Rollins and or the West Linn Chief of Police overlooked and did not adequately address this transgression, which indicates that there is a systemic issue within the agency where integrity and professionalism are not essential values.

Officers Goode, and Gunnarson, under the supervision of Sergeant Gradwhal, put a tremendous amount of effort into not actually doing their job. From the onset, the correct action was to check Relloque's welfare. Officer Goode and Gunnarson, under the supervision and direction of Sergeant Gradwahl, put their fear of a potential negative encounter ahead of their obligation to care for Relloque, who needed medical assistance. Their actions, in totality, fell far below accepted standards of care.

Adam Bercovici

April 13, 2025

_____

EXHIBIT 1

Page 20 of 26

Exhibit A

**Depositions**

Dana Gunnarson

Jeffrey Cook

Larry Redler

Mathew Goode

Melissa Birdwell

Michale Relloque

Oddi Rollins

Todd Gradwahl

Yevgeniy Misyuk

Police Report DEF0027-0184

DEF1342-1393

Marion County Sheriff's report DEF0203-0210

Training Records DEF0894-901

Gunnarson Guardian Tracking DEF0974-1014

Gradwahl DPSST Transcript DEF0897-893

Gradwahl Guardian Tracking DEF0957-973

Agenda _LEIC_Applied De escalation DEF0849-0850

De escalation Training BHU (DEF0851)

Goode DPSST IRIS DEF0852-856

Phone Records Bates 319-323

Bates 318

Bates 324

Complaint

IACP Responding to Persons Experiencing a Mental Health Crisis August 2018

Defendants Answers and Affirmative Defense

Who is who, list of individuals involved in this case

EXHIBIT 1
Page 21 of 26

EXHIBIT 1
Page 22 of 26

Exhibit B

**Titan National Consulting Group, LLC Expert Fee Schedule**

Retainer-Non-Refundable-$5000 (must be paid prior to the commencement of any work)

Fees will be subtracted from the initial retainer until it is depleted at which point billing will be for work completed. Client will be invoiced every 30 days. Invoices are due within 15 days of receipt.

Late fees are applied for payment that are past 30-days. Late fees are 2% of the outstanding invoice and  will be applied for any additional 30 days that payment is outstanding.

Retainer Non-Refundable-$5000

Document review/preparation/report completion- $350 per hour

Deposition/Trial Testimony-$500 per hour

Air, Car Rental, Lodging and Per Diem will be billed and itemized separate from case billing. Travel and lodging invoices are due on receipt.

Air Travel: Flights under two hours-economy or comfort plus- over four hours-business class

Lodging: Deposition or trial preparation.

Travel Time: $150.00 per hour-portal to portal ($2000-day maximum) Travel Related Expenses:

gas, mileage (Federal Rate). Per diem $ 120.00 per day

EXHIBIT 1
Page 23 of 26

Exhibit C

Expert Cases (Deposition, Report and Trial Testimony) in Past Four Years

- Henry v. Municipality of Anchorage - United States District Court of Alaska - Case No. 3:15-cv-000187-RRB - Deposition-Rule 26-Report Plaintiff Verdict IA Best Practices-Brady (D)

- Lassarte v. Catalina Cylinders - Los Angeles Superior Court - B295059 - Deposition Defense Verdict (D)

- Fear v. City of Exter - Superior Court State of California, County of San Luis Obispo Case No. 17CV-0529 - Deposition and Trial Testimony Plaintiff Verdict ( 21 million dollar verdict)  Qualified as a K9 Expert (P)

- Contreras v. Compton - United States District Court for the Central District of California - Case No. 2:17-CV08834-FFM - Deposition-Rule 26-Report Settlement  (D)

- Hunnicutt v. MARTA - Superior Court of Fulton County (Georgia) - Case No. 2017CV290575 – Deposition-Crime Foreseeability (P)

- Thurman v. Spokane - Superior Court of Washington for Spokane County - No. 19-2-03787-32 - Deposition-Report Internal Affairs Best Practices (P) Plaintiff Verdict 19 million dollars

- Wence v. Cruz Superior Court-State of California-Contra Costa County-C18-02060-Deposition-Settled (D)

- Hartt v. Keizer Police Department- Marion County Superior Court, Salem, Oregon 18CV29560-Trial Testimony-Defense Verdict  Qualified as a  K9 and Use of Force Expert (P)

- Bryant v. County of United States District Court for the Central District of California:20-cv-09582-JFW-E  Deposition Rule 26- Report Trial Testimony  Plaintiff Verdict (30 million dollars) Qualified as Police Best Practices Expert (P)

- Depp v. Heard-Virginia State Court- Fairfax County CL-2019-0002911 Deposition and appearance at trial. Report (D)

- Sands v. District of Columbia  2021-CA699B-Rule 26 Report -Deposition Police Use of Force-Crowd Control (P) Trial October 2024  Case settled

- Gittler v. Midjit Market District Court Clark County, NV Case No. A-19-788723-c-Report- Case Settled  (D)SECURITY

EXHIBIT 1
Page 24 of 26

- Chavez v. City of Vernon-Riverside, California Superior Court- BC719460 Deposition mistrial. (D)

- Upson v. City of Phoenix- Arizona State Court- Rule 26 Report-Deposition-Settled  (P)

- Hart v. City of Redwood United States District Court Northern District of California Case No. 3:21-cv-02653 Rule 26 Report Deposition Police Use of Force (P) Case in appeal

- Anderson v. Securitas  Circuit Court State of Oregon  Case No. 19CV45425-Trial Testimony Qualified as Security Best Practices Expert (D) Defense Verdict  SECURITY

- De Los Santos V. Weith  Superior Court for the State of California, County of San Francisco Case no. C.G.C. 19-578634 Deposition Case Settled (P)  SECURITY

- Hurley v. Nevada Property d/b/a Cosmopolitan Case No A-21-8344560-C- Superior Court Clark County Deposition Report (P) Case Settled  SECURITY

- Hector Hernandez v. City of Fullerton Case No. 8:20-CV-01747-CJE-JDE Rule 26 Report Deposition (P) Case Settled

- Bethany Farber v. City of Los Angeles  Case no. 2:19-cv-JAM-CKD Rule 26 Report Deposition (p) in the appeal process

- Michael Jacobs v. Denver Police Department (p)  Case No. 2021CV33187 Rule 26 Report-Case Settled

- Diane Ramirez v. Patriot Shield Case (p)No 2:19-cv-JAM-CKD Rule 26 report  Case Settled   SECURITY

- Tovar v. City of San Jose (p) Case No 5;21-cv-02497  Rule 26 Deposition

- Armstead v. Oakland PD and Alameda County 3:21-cv-05257 Rule 26  2.4-million-dollar settlement

- Garza v. City of Salem, US District Court Oregon  Case 3:22-cv-00721_HZ  3.14 million Dollar Verdict  Police Use of Force

- McCoy v. City of Vallejo US District Court Eastern District of California Case no. 2:19-cv-JAM-CKD Rule 26 Report and Deposition 5-million-dollar settlement

- Rous v. City of Asheville , et al  1:2022cv00005 United States District Coury Asheville Division ( Case Settled)

EXHIBIT 1

Page 25 of 26

- Townsend v. City of Portland Multnomah Circuit Court Case no. 22CV05575 Testified as Lethal Force Expert $1,580,300 Jury Verdict

- Cira v. City and County of San Francisco United States District Court Northern District of California Case No-4:22-cv-07510 Rule 26 Deposition- Interlocutory appeal June 2024

- The Estate of Ron Marquise Adams v. City of San Bernadino  Case No. 5:22-CV-02206-JB-SP Rule 26 Case Settled

- Greenstone v. Las Vegas Metropolitan Police/ Vidal Contreras Case No. 3AN-21-7437CI Rule 26 Report  Defense case

- Jenny Kwon v. NBP Capital, LLC; et al Case No. 22CV34794 Case Settled- SECURITY

- Marcus Boyd v. County of San Diego Case Number Case No. 37-2-23-00002923-CU-CR-CTL  $543,000 Plaintiff Verdict.

EXHIBIT 1
Page 26 of 26

# ADAM BERCOVICI

Results-Centric, Solutions-Focused Police Practices and Security Expert

 Bend, OR 97702      (661) 607-4324      adam@titanncg.com

## PROFFESIONAL SUMMARY

**Nationally recognized Police Use of Force, Police Best Practices and Security Policy Expert** with over 40 years of distinguished service in law enforcement, security, and investigations. Adept leader in high-risk environments, renowned for advanced knowledge in law enforcement trends, best practices, and protocols. Demonstrates exceptional confidentiality, professionalism, and influential media presence.

## PROFESSIONAL EXPERIENCE

### Elite Police Leadership (1982 – 2012)
Led premier investigative units, including the FBI Violent Crime Task Force, Joint Terrorism Task Force and Homicide Special Section and the Special Investigation Section. Has testified as a police use of force and police best practices expert in State and Federal Court.  Established the selection process for the Special Investigation Section-a premier tactical and surveillance unit.  Led the working group that authored the LAPD Undercover Directive.

### Security CEO (2010 – 2017)
Former CEO of Critical Solutions Protective Services Group, a Los Angeles bases security company

### Policy Development and Publication
Pioneered research on officer-involved shootings and active shooter scenarios.

### Expert Witness and Advisory Services
Provided expert testimony on police use of force, police best practices, patrol policy, crowd management, K9 Operations, Undercover tactics,  tactical operations, complex investigations and security practices.

### Client Base Development
Established strategic partnerships with Fortune 500 companies and media outlets.

### Media Presence
Served as an on-camera expert and executive producer for The Discovery Channel.

## EXPERT CASES – DEPOSITION, REPORT & TRIAL TESTIMONY (details upon request)

- Henry v. Municipality of Anchorage – United States District Court of Alaska – Case No. 3:15-cv-000187-RRB – Deposition-Rule 26-Report Plaintiff Verdict IA Best Practices –Brady (D)
- Mya Hendrix v. City of San Diego Case No. 37-2019000002275-CU-PO-CTL Case Dismissed (D)
- Lassarte v. Catalina Cylinders – Los Angeles Superior Court – B295059 – Deposition Defense Verdict (D)
- Fear v. City of Exter – Superior Court State of California, County of San Luis Obispo Case No. 17CV-0529 – Deposition and Trial Testimony Plaintiff Verdict ($21-MillionVerdict) Qualified as a K9 Expert (P)
- Contreras v. Compton – United States District Court for the Central District of California – Case No. 2:17- CV08834-FFM – Deposition-Rule 26-Report Settlement (D)
- Hunnicutt v. MARTA – Superior Court of Fulton County (Georgia) – Case No. 2017CV290575 – Deposition- Crime Foreseeability (P)
- Thurman v. Spokane – Superior Court of Washington for Spokane County – No. 19-2-03787-32 – Deposition – Report Internal Affairs Best Practices (P) Plaintiff Verdict 19 million dollars
- Wence v. Cruz Superior Court-State of California – Contra Costa County – C18-02060-Deposition-Settled (D)
- Hartt v. Keizer Police Department- Marion County Superior Court, Salem, Oregon 18CV29560 – Trial Testimony – Defense Verdict Qualified as a K9 and Use of Force Expert (P)
- Bryant v. County of U.S. District Court for the Central District of California:20-cv-09582-JFW-E Deposition Rule 26 – Report Trial Testimony Plaintiff Verdict ($30 Million) Qualified as Police Best Practices Expert (P)
- Depp v. Heard – Virginia State Court-Fairfax County CL-2019-0002911 Deposition & Trial Appearance. Report (D)
- Sands v. District of Columbia 2021 – CA699B-Rule 26 Report – Deposition Police Use of Force-Crowd Control (P)
- Gittler v. Midjit Market District Court Clark County, NV Case No. A-19-788723-c-Report – Case Settled (D)  **SECURITY**
- Chavez v. City of Vernon-Riverside, California Superior Court – BC719460 Deposition mistrial. (D)
- Upson v. City of Phoenix- Arizona State Court – Rule 26 Report – Deposition-Settled (P)

- Hart v. City of Redwood United States District Court Northern District of California Case No. 3:21-cv-02653 Rule 26 Report Deposition Police Use of Force (P)
- Anderson v. Securitas Circuit Court State of Oregon Case No. 19CV45425 – Trial Testimony Qualified as Security Best Practices Expert (D) **SECURITY**
- De Los Santos V. Weith Superior Court for the State of California, County of San Francisco Case No. CGC 19- 578634 Deposition Case Settled (P) **SECURITY**
- Hurley v. Nevada Property d/b/a Cosmopolitan Case No A-21-8344560-C – Superior Court Clark County Deposition Report (P) Case Settled **SECURITY**
- Hector Hernandez v. City of Fullerton Case No. 8:20-CV-01747-CJE-JDE Rule 26 Report Deposition Case Settled
- Moregenstern Law Firm-Wence v. Cruz (Use of Force)
- Glasser Weil Gross v. Gross (Expert – Private Investigations Best Practices)
  Howard & Howard Douris v. Henderson NV (Use of Deadly Force)
- Johnson v. Caesars Palace (Premise Liability) Case Settled **SECURITY**
- Kramer, DeBoer & Keane (Security Guard Operations) **SECURITY**
- Law Offices of Patrick Buelna McCoy v. Vallejo (Shooting Policy – Use of Deadly Force 5 million Dollar Settlement
- Richard A. Criummo & Associates (Police Tactics – Officer Involved Shootings – Pursuit Policy)
- Heath and Yuen- Santos v. Weith (Security Guard Operations) **SECURITY**
- Hall Griffin-JohnI.L. Doe v. Mi Ju Security (Security Guard Best Practices) **SECURITY**
- Hamparyan Personal Injury-Celani v. Westfield Corporation (Premise Liability) **SECURITY**
- Kafoury and McDougal Garza v. Salem ( Excessive Force)-Rule 26 –(P) 3.15-million-dollar verdict

## PROFESSIONAL SYNOPSIS

| | |
|---|---|
| **TITAN NATIONAL CONSULTING, LLC** | **2012 – PRESENT** |

Police Consulting, Expert & Investigative Company
**Owner │ Consultant │ Senior Investigator**

| | |
|---|---|
| **CRITICAL SOLUTIONS PROTECTIVE SERVICES GROUP** | **2010 – 2017** |

Los-Angeles-Based Security Company
**CEO**

| | |
|---|---|
| **LOS ANGELES POLICE DEPARTMENT** | **1982 – 2012** |

Rapidly Advanced to Roles of Greater Accountability & Responsibility Due to Performance Excellence; Recipient of 50 Bureau/Major Commendations and 300+ Area Commendations; Recipient of the Police "Medal for Bravery" (1993) and Police "Meritorious Unit Citation" (1994) by the Los Angeles Police Department (LAPD).

| | |
|---|---|
| **Robbery – Homicide Division, Homicide Special Section** | |
| Lieutenant II │ Officer-in-Charge | **2011 – 2012** |
| **Robbery – Homicide Division, Special Investigation Section** | |
| Lieutenant II │ Officer-in-Charge | **2003 – 2011** |
| **Major Crimes Division, FBI Violent Crime Task Force Los Angeles** | |
| Joint Terrorism Task Force – Surveillance Special Section Lieutenant II │ Officer-in-Charge | **2002 – 2003** |
| **Burglary – Auto Theft Division, Field Enforcement Section** | |
| Federal Theft Task Force Lieutenant II | **2000 – 2001** |
| **North Hollywood Area** | |
| Lieutenant I │ Watch Commander │ Mobile Field Force Leader | **1999 – 2000** |
| **Internal Affairs Division, Advocate Section** | |
| Sergeant II | **1998 – 1999** |
| **Van Nuys Area** | |
| Sergeant II │ Watch Commander │ Assistant Watch Commander | **1996 – 1998** |
| **West Los Angeles Area** | |
| Sergeant II Vice Supervisor | **1995 – 1996** |
| **Operations West Bureau CRASH** | |
| Sergeant I | **1994 – 1995** |

EXHIBIT 2
Page 2 of 3
**Curriculum Vitae** │ Adam Bercovici                                                                    Page **2** of **3**

**77th Street Area**
Sergeant I **1993 – 1994**

**Metropolitan Division**
Police Officer III | K9 Handler **1989 – 1993**

**Metropolitan Division**
Police Officer III **1987 – 1989**

**Wilshire Area**
Police Officer III | Field Training Officer **1985 – 1987**

**Operations West Bureau CRASH**
Police Officer II | Gang Suppression Officer **1985**

**Wilshire Area**
Police Officer II **1984 – 1985**

**Foothills Area**
Police Officer I **1982 – 1984**

## EDUCATION & PROFESSIONAL DEVELOPMENT

**Bachelor of Arts in English Literature**
CLAREMONT MCKENNA COLLEGE

**Certifications**
Basic | Intermediate | Advanced | Supervisor | Management
CALIFORNIA POST

## REFERENCES

Excellent Professional References Provided Upon Request

## Titan National Consulting Group, LLC Expert Fee Schedule

<mark>Retainer-Non-Refundable-$5000 (must be paid prior to the commencement of any work)</mark>

Fees will be subtracted from the initial retainer until it is depleted at which point billing will be for work completed.  Client will be invoiced every 30-days.   Invoices are due within 15 days of receipt.

Late fees are applied for payment that are past 30-days.  Late fees are 2% of the outstanding invoice and will be applied for any additional 30 days that a payment is outstanding.

Retainer Non-Refundable-$5000

Document review/preparation/report completion- $350 per hour

Deposition/Trial Testimony-$500 per hour

Air, Car Rental, Lodging and Per Diem will be billed and itemized separate from case billing. **Travel and lodging invoices are due on receipt.**

Air Travel: Flights under two hours-economy or comfort plus- over four hours-business class

Lodging: Deposition or trial preparation.

Travel Time: $150.00 per hour-portal to portal ($2000-day maximum) Travel Related Expenses: gas, mileage (Federal Rate). Per diem $ 120. 00 per day

EXHIBIT 3

Page 1 of 1

# INVOICE

**Titan National Consulting Group, Corp.**
19628 Poplar St
Bend, OR 97702

adam@titanncg.com
+1 (661) 607-4324
titannational.net

**Bill to**

Beth Creighton
Creighton & Rose, PC
735 SW First Ave
Suite 300
Portland, Oregon 97204

**Ship to**

Beth Creighton
Creighton & Rose, PC

**Invoice details**

Invoice no.: 1335
Terms: Due on receipt
Invoice date: 04/11/2025
Due date: 04/11/2025

| # | Date | Product or service | Description | Qty | Rate | Amount |
|---|---|---|---|---|---|---|
| 1. | 02/02/2025 | **Expert Witness Services** | Review of MSJ Material 2 hrs | 2 | $350.00 | $700.00 |
| 2. | 02/09/2025 | **Expert Witness Services** | Review of MSJ Material 3 hrs | 3 | $350.00 | $1,050.00 |
| 3. | 03/31/2025 | **Expert Witness Services** | Worked on Rule 26 Report 6 hrs | 6 | $350.00 | $2,100.00 |
| 4. | 04/02/2025 | **Expert Witness Services** | Worked on Rule 26 Report 2hrs | 2 | $350.00 | $700.00 |
| 5. | 04/07/2025 | **Expert Witness Services** | Worked on Rule 26 Report 3 hrs | 3 | $350.00 | $1,050.00 |
| 6. | 04/09/2025 | **Expert Witness Services** | Worked on Rule 26 Report 2 hrs | 2 | $350.00 | $700.00 |
| 7. | 04/10/2025 | **Expert Witness Services** | Worked on Rule 26 Report 2 hrs | 2 | $350.00 | $700.00 |
| 8. | 04/11/2025 | **Expert Witness Services** | Worked on Rule 26 Report 2 hrs | 2 | $350.00 | $700.00 |

## Ways to pay

     

| Total | **$7,700.00** |
|---|---|
| **Overdue** | 04/11/2025 |

**View and pay**

EXHIBIT 4

Page 1 of 2

EXHIBIT 4
Page 2 of 2