Beth Creighton, OSB #972440
E-mail: *Beth@civilrightspdx.com*
Richard E. Oberdorfer, OSB #013714
E-mail: *Rich@civilrightspdx.com*
Kristin R. Bell, OSB #235024
E-mail: *Kristin@civilrightspdx.com*
CREIGHTON & ROSE, PC
735 SW First Ave., Ste. 300
Portland, Oregon  97204
Phone:   (503) 221-1792
Fax:       (503) 223-1516
Of Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **MICHAEL AUSTIN RELLOQUE, IV**, | Case No. 3:22-cv-01781-SI |
| Plaintiff, | |
| vs. | **PLAINTIFF'S WITNESS LIST** |
| **CITY OF WEST LINN, MATTHEW GOODE, DANA GUNNARSON, TODD GRADWAHL,** | |
| Defendants. | |

Plaintiff may call the following witnesses to testify at trial. Plaintiff reserves the

right to change what topics the witnesses testify about, dependent upon the pre-trial

CREIGHTON
& ROSE, PC

ATTORNEYS
AT LAW

735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

rulings, and reserves the right to call additional witnesses for the purpose of impeachment and rebuttal.

1.    **Andrew (Drew) Artiga (30 minutes)** (206) 234-6477, 4005 N. 19th St. Tacoma, WA 98406

Andrew (aka Drew) Artiga went with Michael Relloque III to talk to Sgt. Gradwahl on November 16, 2020 while Michael Relloque IV was in the hospital.  He will testify that they called and set up a meeting. He will testify that when they arrived at the police station, the location of the meeting, at the agreed upon time, the police station was locked, and they had to buzz to get into the building. There was no answer to their buzz right away. They knew someone was inside because they parked and observed a person enter as they were arriving. Once they were buzzed in, they were in the lobby for over 20 minutes before Gradwahl came out and talked to them. Gradwahl asked for their ID and was guarded. Artiga felt that Gradwahl knew more than he was telling them. Gradwahl did not tell them a clear story about what happened. Gradwahl did not furnish them with a police report.

Artiga will testify that Gradwahl told him that, according to Melissa Birdwell, before the incident Michael Relloque IV had found mushrooms at a cemetery and planned to eat/use them. Gradwahl further conveyed that around midnight on November 14, 2020, Michael Relloque IV was observed at the top of the stairs in his residence, claiming he was "God," that Relloque kicked a door in to enter Birdwell's room, that Birdwell asked

CREIGHTON
& ROSE, PC

ATTORNEYS
AT LAW

735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

PAGE 2  PLAINTIFF'S WITNESS LIST

him to leave and he did and went back up to his room. Gradwahl conveyed that Birdwell then called 911 and used the sliding door to leave the residence.  Gradwahl also said the police searched around the house and tried to contact Relloque without success, that they used a fire truck ladder to see into the upstairs room with a spotlight and used a bullhorn. Artiga will testify that Gradwahl said he advised Birdwell to stay elsewhere and that the unit left the house. Gradwahl further said they did not want to have to shoot Relloque, so they did not go in. Gradwahl said the next shift checked the residence at 4 AM and Relloque's car was still there, and that around 6 AM Relloque was gone. Gradwahl further said that around 7 AM Relloque's car was found in Turner, Oregon, where he was banging on a café door and screaming for help. Gradwahl also said the police could arrest Relloque for being under the influence of mushrooms, but given the circumstances Gradwahl will not make the arrest. Artiga will testify that Gradwahl did not apologize for what happened.

Antiga will testify about helping to pick up Relloque's car in Salem. There was blood and stains in the car, and the windows were open when they picked it up.

As the cousin of Michael Relloque, Sr, Artiga had regular contact with Relloque. He attended many of the football games at Pacific University and spent hours with Relloque surfing and engaging in other active endeavors. He will testify that the week prior to November 14, 2020, Artiga spent the weekend surfing with Relloque and they were happy doing one of the many activities Relloque loved. Relloque also enjoyed mountain biking and rock climbing. He was starting to learn how to play golf. He was a

CREIGHTON
& ROSE, PC

ATTORNEYS
AT LAW

735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

fully active young college graduate with the world ahead of him. Relloque got a job as a production assistant and began working in the Fall of 2020. He was very outgoing and open. He was very social and had plenty of friends. Relloque knew how to approach people and was always making friends. Relloque always seemed level and respectful and Artiga never saw him at a low point. He liked to have in-depth conversations and had loads of self confidence. Prior to November 14, 2020, Artiga had conversations with Relloque about how he wanted to learn to play the guitar.  Artiga was going to give him a guitar when he saw him for Thanksgiving.

Artiga will testify that, after the November 14, 2020 incident Michael Relloque, IV changed. He became more withdrawn, and does not go out in the world as frequently. His injuries have affected his level of confidence and he is doing as much as he can within his physical limitations. When they talk, they dance around the topic of Relloque's injuries. Relloque tries to put a positive spin on his progress, but Artiga can see that Relloque is depressed as compared to who he was prior to November 14, 2020.

### 2.    **Melissa Birdwall (40 minutes)** (626) 873-4285

Mellissa Birdwell was Michael Relloque IV's roommate in the Fall of 2020. She met Relloque through Facebook when looking for a roommate. They were not romantically involved. She lived at 19856 White Cloud Circle from March 2020 through the following year. She will describe the layout of the house and identify the photos she took the day after the November 14, 2020, incident.  She worked at Lake Oswego Country

CREIGHTON
& ROSE, PC

ATTORNEYS
AT LAW

735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

Club as a server/bartender during this time.

About a week before the November 14, 2020 incident, Relloque told her he found mushrooms at a cemetery. Relloque had air-dropped photos of mushrooms to her phone. They had general discussions about psychedelics and psilocybin. She had never seen Relloque ingest mushrooms prior to November 14, 2020.

On November 13, 2020, she went to bed around 9 PM. Shortly after midnight, Birdwell woke up to the sound of Relloque screaming. She got up, opened her door to check to see what was going on, and saw Relloque at the top of the staircase naked, with his arms in the air screaming that he was "God." She screamed back "NO!" and then slammed and locked her bedroom door. Relloque ran down the stairs and kicked in the door. He started looking around and saying things like "We did it" and things she did not understand. Birdwell felt threatened and Relloque's behavior scared her, so she ran behind her couch. She armed herself with a pair of scissors because she was "worried he was dangerous."

Birdwell observed triangle markings on Relloque's body and stated he had bloody and/or burnt hands. She smelled burnt hair and/or skin. Birdwell told him to "snap out of it." Relloque responded "I will," but then proceeded to jump on her bed on all fours. Birdwell told him to get out of her room and Relloque left. Thereafter, she heard Relloque using clippers and screaming.

Birdwell then called 911. In that 911 call, she stated the call was to request medical

CREIGHTON
& ROSE, PC

ATTORNEYS
AT LAW

735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

assistance. She told dispatch her roommate flipped out, burnt himself, and that she thought he needed medical attention. She said her roommate was acting crazy, saying "I am god," and kicked her locked door open and walked around her room. She told dispatch that she thought he hurt himself, and that he was burnt on his arm, naked and had markings all over his body. She said that it "smells really bad like burnt skin or something." Birdwell believed that he had a significant injury and that there was something wrong with his hands. The 911 operator informed Birdwell that the police were on their way and she left the house. Three officers arrived on the scene. Medical personnel were also present at scene. Birdwell will testify that she told the officers what she told dispatch, and the officers questioned Birdwell about her roommate's name, age, race and whether he had weapons. Even though she told them Relloque was screaming, they did not ask if he sounded like he was screaming in pain. She told them that Relloque could be Hispanic, and described him as having a "darker complexion." She showed Gradwahl a photo of Relloque's Facebook page profile. She described the burning smell to the officers and said that his hands were black, like they had been put in a fire. She described the marking on his body as "some sort of strategically-placed marking" "like a ritual it almost looked like." She told the officers that the fireplace was going. The fireplace was visible from the main floor window which was accessible. None of the officers talked to Birdwell about getting Relloque medical attention from the medical personnel present on the scene.

Birdwell will testify that, had the officers asked her, she would have given them

CREIGHTON
& ROSE, PC

ATTORNEYS
AT LAW

735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

permission to enter the residence, but the officers did not ask her if they could enter the residence.

The police did not enter the residence, but instead suggested letting him "ride out his high" and said that she should stay elsewhere for the night. The officers cited recent protests as reason for not wanting to enter the premises. Birdwell was surprised that the police did not go in and help Relloque. Birdwell's boyfriend picked her up after the police arrived and she spent the rest of the night with him.

Upon returning to house around 7 AM, Birdwell saw that Relloque's car was gone. Birdwell found his hair shaved off in bathroom, what appeared to be a finger in toilet, burnt pieces of things around the house, overturned chairs and triangle markings on the windows and whiteboard. Officers later notified her Relloque was found in Salem badly burnt. Birdwell will testify that she called 911 that morning, and said she found someone's finger chopped off and in the toilet in her home. The responding officer came to the residence, asked her questions, and took photographs and evidence.

**3.** **Jeffrey Cook (30 minutes)** (503) 649-8577 Tualatin Valley Fire & Rescue Station 58, 6050 Failing Street, West Linn, OR 97068

Lieutenant Jeffrey Cook is a lieutenant in Tualatin Valley Fire & Rescue, and has been since 2001, and in 2020, was also a paramedic. He is expected to testify consistently with his deposition testimony. As a lieutenant, Cook sits in front right seat of the engine and has access to the CAD computer. He has limited access to CAD notes during an

CREIGHTON & ROSE, PC
ATTORNEYS AT LAW
735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

incident; can only see about 3-4 lines at a time. Further, as a lieutenant, he was the TVF&R officer-in-charge at the scene of the events at issue.

Very early in the morning on November 14, 2020, he and his engine responded to a code one stage call at White Cloud Circle, which means no lights or sirens, park away from the incident, and wait for the police to declare the scene is safe to approach. On code one calls, it is the responsibility of police to determine scene safety; and that fire personnel cannot enter without police clearance, and that TVF&R personnel must wait for dispatch to relay police clearance before entering scene.

His engine initially staged away from the scene, and later moved closer at police request. Even when they moved closer, he and the engine were 75-100 yards away from the residence, and he could only see right side of house. He never got out of the fire engine during the entire incident. He had no direct contact with any potential patients or witnesses, and besides a communication where WLPD asked to borrow a ladder, all his communications with WLPD were through dispatch. He never assessed or treated any patients at the scene. WLPD never told him they determined the scene was safe. WLPD cleared them to return to their station. As a paramedic, Cook is trained in assessing burns, drug overdoses, and behavioral health situations, but that he cannot properly assess injuries without seeing/examining patient and he was not asked to do so on this call. No one ever asked his advice about how to contact Relloque or if they should abandon their efforts to make contact. He received no information about Relloque's condition from the

CREIGHTON
& ROSE, PC

ATTORNEYS
AT LAW

735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

PAGE 8  PLAINTIFF'S WITNESS LIST

WLPD officers on the scene.

He wrote Supplemental Event Report (SER) in June 2021, about 6 months after the incident, and that the report was requested due to potential lawsuit.

4.    **Matthew Goode** (60 minutes) (503) 655-6214 West Linn Police

Department, 1800 8th Ave, West Linn, OR 97068

Matthew Goode is currently a police officer with the City of West Linn Police Department. He is expected to testify in a manner consistent with his deposition testimony. He was hired by West Linn Police Department on March 18, 2019, received his basic training certificate in February of 2020, and completed his probationary period on September 18, 2020. He is trained in de-escalation techniques and was commended for his ability to calm people down and put people at ease. He previously worked as an EMT and firefighter in North Dakota. Hhe has EMT training and experience dealing with people in altered states.

Goode will describe his training and WLPD policies related to the incident at issue.

On November 14, 2020, Goode will testify that he was dispatched to the scene around midnight for a behavioral health incident. The night shift has a limited number of calls in West Linn.  Goode was the first officer on the scene. He had a variety of equipment with him when he arrived at the scene including a taser, pepper spray, a gun with beanbag projectiles, a billy club, knives, a bulletproof vest, a breaching ram and a riot shield and a firearm.  He spoke with Melissa Birdwell who reported 1) Michael Relloque,

CREIGHTON
& ROSE, PC

ATTORNEYS
AT LAW

735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

her roommate, was naked and acting erratically, saying "I am God", 2) Relloque had broken through her locked basement door, 3) Birdwell saw burns/soot marks on Relloque and smelled burnt skin, and 4) she grabbed scissors to defend herself from him.

Goode, along with the other officers on the scene made attempts to contact Relloque including walking around exterior of house, looking in windows, using the PA system to attempt communication with Relloque, and using a fire department ladder to check upper windows.

Goode will testify that he smelled something burning in the area of the residence. Goode saw a cell phone on the ground inside. Goode was aware of the reports of possible physical injury to Relloque. Goode believed that Relloque consumed mushrooms, but did not know if his erratic behavior was from ingestion of psilocybin mushrooms or from a mental health disorder or some other medical issue.

Goode did not request permission to enter the house, nor did he enter the house. He is expected to testify his reason for not doing so was that 1) the officers determined they lacked legal authority to enter under community caretaking guidelines, 2) they believed there was a high likelihood of having to use force if they encountered Relloque, 3) there was no clear signs of severe injury or immediate danger, and 4) they were uncertain if Relloque was still in residence.

Goode left the scene between 1:25-1:27 AM. He claims knowing what he knew at the time of his deposition, he would not have done anything differently on the call.

CREIGHTON
& ROSE, PC

ATTORNEYS
AT LAW

735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

Goode wrote a police report that detailed the events of November 14, 2020 and tried to be honest and accurate documenting the relevant information. The report as Goode initially wrote it, originally stated;

> "In talking with Officer Gunnarson and Sgt. Gradwahl, we felt very concerned RELLOQUE was a danger to himself, could have a significant injury to his arm and had possibly overdosed on mushrooms. Additionally, it was apparent he was experiencing a behavior health emergency."

When writing the original report, Goode also stated:

> "Based on my training and experience as a former Firefighter EMT and a current police officer, I know that people often eat mushrooms for their hallucinogenic properties. I also know that these hallucinogenic properties often include profound distortion in a person's perceptions of reality. People under the influence of mushrooms can often be a danger to themselves or others due to their extremely unpredictable state and altered perception of reality."

The information regarding the officers' shared concern that Relloque was a danger to himself, his "significant injury," and his potential overdose were all absent from the final report, as well as the information on the inherent danger of hallucinogens, at the urging of Gradwahl after Relloque's injuries had been disclosed to the WLPD. Goode will testify that he did not enter racial data for Relloque in his police report regarding Plaintiff, even though he had already seen photos of the Plaintiff.

After Goode left the scene he texted with Gunnarson about the possibility of Relloque having left the residence. He also texted with Birdwell and got a screenshot of Relloque's Facebook profile. He claims he did not know Relloques's race at the time of the call, but in the report, he coded Relloque as "white" in the race box of his report. He

CREIGHTON
& ROSE, PC

ATTORNEYS
AT LAW

735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

claims he still would identify Relloque as "white" having seen the Facebook picture.

Sometime during the morning of November 14, 2020, he became aware that Relloque was found in Turner, Oregon, burnt over a significant part of his body. After Goode was informed he would be interviewed about this incident after a tort claim was filed, Goode requested the records from the November 14, 2020, incident from the records clerk as WLPD. Prior to the deposition in this case, he received an email from Todd Gradwahl containing information about ORS information about "what cohabitating means vs. living together as far as domestic violence shall arrest" along with case law.

5.     **Todd Gradwahl (40 minutes)** (503) 655-6214 West Linn Police
       Department, 1800 8th Ave, West Linn, OR 97068

Todd Gradwahl is currently a Sergeant for the City of West Linn Police Department. He is expected to testify in a manner consistent with his deposition testimony. Gradwahl will testify that he retired from Portland Police in August 2020 after almost 26 years of service, and was hired by West Linn Police Department in September 2020 as a Sergeant. Gradwahl will describe his training and WLPD policies related to the incident at issue. At the time of the events described, he was aware of the scandals regarding the WLPD treatment of Michael Fesser, and the death of George Floyd, which prompted protests across the country. He will testify about the community care taking role of the police and the legal manner in which he had authority to enter into a residence and other WLPD policies.

CREIGHTON
& ROSE, PC        ATTORNEYS
                 AT LAW

                 735 SW First Ave., #300
                 Portland, OR 97204-3316
                 T. (503) 221-1792
                 F. (503) 223-1516
                 beth@civilrightspdx.com

He will testify that on November 14, 2020, he responded to a call at 19856 White Cloud Circle which was coded as a behavioral health incident. He had a variety of equipment with him when he arrived at the scene including a taser, pepper spray, a gun with beanbags projectiles, a billy club, knives, a bullet proof vest, a breaching ram and a riot shield and a firearm. As the senior officer on the scene, he was in control of what the police did and did not do at the scene. No body cameras or dash cameras were in use during the call. The 911-caller, Melissa Birdwell reported: 1) Relloque came downstairs naked, kicked in her bedroom door and said he was "God," 2) had dirt/ash on his chest and blood/mark on his arm, and 3) she grabbed scissors and fled through slider door after calling 911. She reported that he may have taken mushrooms. Neither Gradwahl or his fellow officers requested Birdwell's permission to enter the house.

Instead, he will testify about the officer's efforts to make contact - phone calls, verbal commands, PA system/loud hail, walking perimeter, and using a ladder to look in the window. Gradwahl will testify he told Birdwell that she should find somewhere else to stay for the night.

Gradwahl will testify that he believed the governmental interest wasn't high enough to force entry, he was concerned about potential use of force situation and believed Relloque was hiding rather than incapacitated. Gradwahl admits that community perception influences his analysis of "governmental interest." At no point while at 19856 White Cloud Circle did the officers indicate that they believed that Relloque had left the

CREIGHTON
& ROSE, PC

ATTORNEYS
AT LAW

735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

scene. The officers had no information that Relloque had left the scene. Gradwahl did not talk to the medics who were on the call from Tualatin Valley Fire & Rescue to get their advice about what to do. Gradwahl called Captain Rollins for consultation before leaving scene. Gradwahl told the fire department to leave and then the officers closed the call.

Gradwahl was still concerned about Relloque and drove by the residence again around 4 AM and saw a light on, but did not go to the door to try to make contact because he was under the impression that Gunnarson had recently tried to call Relloque and he still was not answering phone calls. Later that morning, Gradwhal learned Relloque had been found burned over a significant part of his body and hospitalized.

Gradwahl will testify he was Goode's supervising officer and read Goode's report before it was submitted. Gradwahl suggested that Goode take out what he had written about smelling burnt flesh. Goode originally wrote "He [Relloque] had ash and dirt on his chest and arms. She could smell burnt flesh and his right arm looked burnt. He was acting in a crazy mental episode." That language was changed to "He had what looked like ash or dirt on his chest and arms but was unsure. She could smell 'burnt skin' and he looked like he may have a burn or blood on his arm."

Gradwahl wrote his own report and he will testify about the contents of that report. Gradwahl will claim he did not personally know Relloque's race, never saw a picture of him, and relied on auto-populated information in the report system regarding race.

/ / /

CREIGHTON
& ROSE, PC

ATTORNEYS
AT LAW

735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

Two days after the incident, on November 16th, Gradwahl met with Michael Relloque Sr. to discuss the incident and told him what they did on the call and what information the WLPD knew, how the WLPD responded and the reasons why they did not enter the house and had left.

After Relloque's tort claim notice was sent in May of 2021, Gradwahl requested information about the call from WLPD records division prior to an interview about this matter. He received a thumb drive with that information.

Prior to the depositions in this case Gradwahl sent both Goode and Gunnarson an email containing information about ORS information about "what cohabitating means vs. living together as far as domestic violence shall arrest" along with caselaw.

**6.    Dana Gunnarson  (30 minutes)** (503) 655-6214 West Linn Police

Department, 1800 8th Ave, West Linn, OR 97068

Dana Gunnarson joined West Linn Police Department after working with the Gresham Police Department.  She is expected to testify in a manner consistent with her deposition testimony.  She has testified in court over 50 times, primarily in grand jury and domestic violence hearings.

Gunnarson has undergone various training programs and has been involved in ongoing professional development, including Crisis Intervention Training and crisis negotiation training. She participated in Police One Academy for online training assignments. She will testify about WLPD policies and the community care taking role of

PAGE 15  PLAINTIFF'S WITNESS LIST

CREIGHTON & ROSE, PC

ATTORNEYS AT LAW

735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

the police and the legal manner in which she had authority to enter into a residence. Gunnarson will testify she does not feel that the WLPD promotes an environment that encourages employees to advocate for what is right.

Gunnarson will testify that she responded to a behavioral health incident involving Michael Relloque on November 14, 2020. She heard dispatch about a roommate reporting a behavioral health crisis, including details about the subject's behavior. She arrived at the scene with Officer Goode and Sergeant Gradwahl, and met with the reporting party, Birdwell.

Gunnarson had a conversation with Birdwell regarding the incident involving her roommate. Birdwell's demeanor was elevated but communicative. Birdwell reported her roommate had kicked in a door, was naked, and exhibited erratic behavior. Birdwell mentioned a possible burn on her roommate's arm. Birdwell mentioned her roommate had ingested mushrooms. She expressed uncertainty about her roommate's condition. Gunnarson will testify that she defines community care taking as the necessity to intervene when someone is at immediate risk of serious physical injury.

The officers then assessed the situation and discussed the best course of action. The officers discussed the lack of a crime based on Birdwell's statements and determined they did not have legal authority to enter the residence. The officers discussed potential criminal mischief due to a kicked-in door but concluded there was insufficient evidence for any crime. There was no individual analysis conducted for each crime regarding intent,

CREIGHTON & ROSE, PC

ATTORNEYS AT LAW

735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

even though Gunnarson acknowledges that intent is crucial for crimes that require a culpable mental state, such as criminal mischief. They did not consider charges such as trespassing, menacing, or harassment based on the information available. Gunnarson will discuss the impact of being high on mushrooms on a person's mental state and how it relates to culpable mental states in crimes. Concerns were raised about the roommate being impaired on mushrooms, which could affect his ability to respond to commands. The officers attempted to contact the roommate via phone and knocked on the door but received no response.

Gunnarson does not believe that the officers had the legal authority to enter a private residence to place Relloque on a hold. She will explain that being impaired alone is insufficient for a mental health hold; there must be evidence of immediate risk of serious physical injury. She will testify that the officers did not call for medical assistance as they did not have enough information to justify it.

Gunnarson will testify that the officers discussed their observations and actions taken, including attempts to contact the roommate and the lack of response. They decided to end the call without making contact with Relloque.  Gunnarson did not write a report for the incident in question and did not take notes.

**7.     Olivia Navarro (60 minutes)** (209)420 6687

Olivia Navarro is Relloque's girlfriend. They met in high school and went to junior prom together. Senior year, they were both in the homecoming court. They were friends

CREIGHTON
& ROSE, PC

ATTORNEYS
AT LAW

735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

and kept in contact when Relloque was at Pacific University and Navarro was in San Diego for school, seeing each other when they were on breaks and holidays.

Navarro will testify that she always knew Relloque to be extremely active; playing football, rugby, swimming, rock climbing and hiking. He was always involved in sports. He was very social. He floated around to all different social groups, not confining himself to one group of friends.

Navarro talked to Relloque about a week prior to the incident. Relloque was proudly reporting to her he thought he had saved up enough to put a down payment on a house.

At first when she heard Relloque was in the ICU, she was incredulous. She thought it was a joke, then spoke to others who confirmed it was true. Although she was unable to visit, she sent him letters when he was in the hospital. She will testify that his family was concerned about showing him a mirror after he was burned so badly. When they finally did, he remarked "damn I am so good looking!" She will testify that once Relloque was in the physical rehabilitation facility, she was able to call him, and they talked biweekly. He seemed really scared about having to hear what happened to him from others. When Relloque was able to come back to Stockton, CA, she continued visiting and hanging out and in 2021 they began dating.

The first few months after being burnt Relloque was in a dark depression. Navarro was really worried about him. He had zero joy. Every ounce of joy and personality was

CREIGHTON
& ROSE, PC

ATTORNEYS
AT LAW

735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

gone and she was scared that he would not get that back, which made her show up even more for him.  Over time she heard his joy come back, but not in the same goofy, glimmery way he had been in the past.  He seems more serious and weighed down by how his condition had affected his family.

Initially, he was mostly concerned with all the things he was unable to do and feared the prospect of not being able to be independent.  He expressed concerns about never being able to drive again or put gas in the car or go to bathroom by himself. He has adapted as well as he can, learning to drive and be independent.  He has always had a positive attitude about his ability to adapt to his condition. His philosophy is "don't be sad about this, but look at all the things we can do."

He is no longer able to rock climb or play football or rugby or lift weights.  He tries to shift to other sports that he can do with his legs. He has figured out how to throw a football with Navarro's little cousin, but can no longer play a game, which he misses a lot. He is no longer able to go in pools because the chemicals are so bad for his skin. The first time he swam in the ocean after 11/14/20, it was really disorienting and scary for him.  He did not have his hands to use as paddles and for control to push off the water. Eventually he figured it out, and can outswim Navarro.

/ / /

/ / /

/ / /

CREIGHTON & ROSE, PC

ATTORNEYS AT LAW

735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

Since he was burned, Relloque is not as extroverted and is more oriented towards his family, Navarro and select friends. Although many of his close college friends were not there for him, he is not resentful about it and has accepted the loss of friendship with generosity.

Relloque grieves the loss of the financial status he had prior to his injuries. He is no longer close to buying a house. There are limitations to the jobs he can do and he essentially cannot work in the field he went to school for because editing and camera work require fine motor skills he no longer has. He cannot type or do the electrical work he used to do.

Navarro and Relloque started living together. She has witnessed his day to day frustration about his inability to do things and how long it takes to do the things he has learned to do, like cook, clean and garden. She does most of cleaning, since Relloque always has open wounds and she is concerned about contact with the cleaning chemicals. She needs to help him with dressing himself with his belt, shoes, shirt buttons, his sock garters, and the things that hold down his shirt. A lot of fine motor tasks he is unable to do on his own. Sometimes he lets Navarro help him and sometimes he does it himself, no matter how long it takes.

Everything is more physically taxing for Relloque. One recent example is raking the leaves from the yard. Relloque did 1/4 of the yard in the time it took Navarro to do the other 3/4th.

CREIGHTON
& ROSE, PC

ATTORNEYS
AT LAW

735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

PAGE 20   PLAINTIFF'S WITNESS LIST

Relloque recently got fitted for a prosthetic. At first. they were told they would have to amputate up to his elbow to get one, but his prosthetic doctor got him fitted for a prosthetic for his current state. It was a long process to get with multiple fittings. It is a simple apparatus, a hook with rubber bands over his right hand. It breaks fairly often, about once a week with constant use.  He is unable to wear it for long periods of time because the prosthetic rips holes in his skin because his skin is so thin. His skin is not tough enough to withstand the chaffing that the prosthetic causes.

Navarro will testify that, despite all of his injuries and trauma, Relloque has had an amazing attitude through it all and had a practice of gratitude. Every night before going to sleep, they say one thing each that they are grateful for.

**8.      Larry Redler (15 minutes)**

Defense counsel informed me that Larry Redler has retired and moved out of state. He is therefore unavailable. Pursuant to FRCP 32(a)4 we are permitted to use his deposition testimony at trial.

**9.      Brianna Relloque (30 minutes)** (209) 487-4623

Brianna Relloque is Relloque's sister. When Relloque returned to California, she was his primary care giver.  She cleaned and dressed his wounds and helped Relloque do the many, many things he was no longer able to do.  She will describe his depressed

/ / /

/ / /

CREIGHTON & ROSE, PC    ATTORNEYS AT LAW

735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

PAGE 21  PLAINTIFF'S WITNESS LIST

mental state and his frustrations with his physical limitations. She will discuss his progress over the course of the time she cared for him and his determination to do and be as much as possible after what happened.

**10.    Michael Relloque III (30 minutes)**

Deposition designations are being submitted for Michael Relloque III, Plaintiff's father. He is deceased and therefore unavailable to testify at trial.  We will offer his deposition testimony pursuant FRCP 32(a)4.

**11.    Michael Relloque IV (90-120 minutes)**

Michael Relloque is the Plaintiff in this case.  He was deposed in this case and will testify consistently with his deposition.  He will describe what life was like prior to his injuries and his hopes and dreams for the future.

Relloque will testify that he graduated from University of Portland in May of 2020 with a degree in film and philosophy. During his senior year at college, he did research on psilocybin mushrooms and decided to try them while on a hike. It was hard to quantify that experience. He remembers feeling that he had a break through regarding problems he did not know he had prior to that point, and experienced the feeling that everything was ok. The effect extended over a couple of months. He had no visual hallucinations, just some temporary change in his vision.

Prior to November 2020, he tried psilocybin mushrooms maybe 2-3 times or so, maybe more, perhaps every 6 months or so. Each time his experience was different. The

CREIGHTON
& ROSE, PC

ATTORNEYS
AT LAW

735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

intensity varied from amount he took. His brain was more pensive and he thought of things in ways that he had not previously. He had no negative effects from mushroom ingestion.

The first time Relloque used cannabis was in the beginning of senior year. It had no effect on him.  He did not often use cannabis, maybe a couple times a month, give or take. As he continued to use cannabis he started experiencing effects. It affected his thinking and thought processes - sometimes more energized and sometimes more relaxed - typical effects it has on people. Most of the time he had a positive experience with cannabis, but sometimes it caused anxiety or panic and increase of heart rate. He started using it more heavily in the late summer of 2020.

In the fall of 2020, he was working as a production assistant on the HULU comedy Shrill.  His job was very physical, doing grunt work on film sets: setting up tents and moving equipment, getting food and coffee, running errands, and keeping set quiet. He essentially did whatever the director asked of him.

Relloque exercised regularly, ate intentionally for health and had no significant prior physical health issues. In the fall of 2020, he was stressed about what going on in the world and in his life. He started experiencing a little anxiety and had a panic episode the day covid shut down school. In the month prior to his injuries his sleep was erratic due to his work schedule.

He responded to a posting on Facebook marketplace for a roommate and moved into 19856 White Cloud Circle in Sept/October 2020.  The residence was a 3 floor house

CREIGHTON
& ROSE, PC

ATTORNEYS
AT LAW

735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

PAGE 23  PLAINTIFF'S WITNESS LIST

in a suburban neighborhood.  The living room had a fireplace and the main entrance was on the middle floor. There was a basement with a bedroom where Melissa Birdwell's room was and 3 bedrooms on the top floor. He was friendly with Birdwell and went out socially with her a few times, but they were not romantically involved. A month or so after he moved in Mychala Reed moved in. Relloque only lived with her a of couple weeks.

The fireplace in the living room was a built into the wall. It burned wood and had a door on it that could be closed. He used it a couple times of week - for heat and for enjoyment

On the morning of November 13, 2020, he got up early and drove to a park in Astoria to forage for mushrooms. He found panther mushrooms and brought them home. Panther cap mushrooms are not psilocybin mushrooms. He sent pictures of the mushrooms to Birdwell since they had discussed using mushrooms in the past. He brought the Panther cap mushrooms home and started processing them in the kitchen to dry them out.

He went to take a covid test later that day and went for a walk/run in park. He was fasting and thinks he potentially ate chicken and rice, but is not sure. At some point that evening, he decided to meditate, so he lit a fire and smoked a small amount of cannabis (he had previously taken a break from smoking). He took off his clothing and wrapped himself in a blanket in front of the fire. He meditated while listening to a 30 minutes guided meditation from Mix on YouTube.  He entered into a deep meditative state and lost track of time. He remembers his roommate Mikayla came in, or was leaving, while he was

CREIGHTON
& ROSE, PC

ATTORNEYS
AT LAW

735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

PAGE 24  PLAINTIFF'S WITNESS LIST

sitting in front of fire. The timeline of the events after he began meditating was jumbled in Relloque's mind and there are chunks of time he does not remember.

As Relloque sat in front of the fire and meditated, he recalls feeling an intense sense of euphoria, like he was one with the fire. He believes that sleep deprivation, fasting regularly, low blood sugar, and exhaustion contributed to his altered state. He came to and recognized that he was inside the fire. After that he thinks he went downstairs into Birdwell's room. He felt like he was a passenger in his own body, like he was unable to feel connected to his actions. He went upstairs and started cutting his hair with clippers. From this he deduced that his hands were functional enough to use clippers.  He believes that he was further burnt after encountering Birdwell that night.

He does not remember hearing police trying to contact him. His phone did not ring or register any phonecalls. He registered an intense burnt smell, it was stomach turning, and he thought he had to open window because it was going to make the house smell.

At some point he began to register that he was not ok and needed help. He tried to contact Birdwell and went to her room. He knocked on her door and apologized for alarming her earlier and asked for her help. She did not answer and he deduced that she was no longer in the house and he was all alone. At some point he remembers preparing and drinking some psilocybin mushroom tea for its healing properties.

Relloque knew that he needed help. He could not access the touch screen on his phone. He was alone and felt isolated. He remembers at some point bathing, thinking that

CREIGHTON
& ROSE, PC

ATTORNEYS
AT LAW

735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

burns were susceptible to infection and he needed to take a shower and clean himself to reduce the risk of infection. He remembers thinking that he has to sleep it off and laid down on his bed for some period of time.

Relloque finally determined he needed to go get himself some help, since no one was there to help him. He got partially dressed and got into his car and drove with no clear destination in mind. He ended up in Turner, Oregon and approached a café where he saw people and banged on the window for help. The Marion County Sheriff arrived and arranged for a transport to Legacy Emmanuel's burn center, where he endured multiple life-saving operations and spent approximately a month hospitalized. He was released to the rehabilitation facility to address his continued physical limitations. He stayed there for 3 months,

He will describe the surgeries he has endured since being released from rehabilitation and the medical treatment he received.

He will describe his new normal and all of the adaptations he has had to do in order to live somewhat independently and the limitations his injuries have to his life. He will describe his efforts to be gainfully employed and his post graduate studies.

12. **Oddis Rollins (15 Minutes)** (503) 655-6214 West Linn Police
     Department, 1800 8th Ave, West Linn, OR 97068

Oddis Rollins currently serves as acting Police Chief at the West Linn Police Department. He became captain in August 2018 and was second in command under Chief

CREIGHTON
& ROSE, PC

ATTORNEYS
AT LAW

735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

Peter Mahuna during the events at issue. He directly supervises all seven sergeants, including Gradwahl, and indirectly supervises officers. His responsibilities include overseeing patrol operations, scheduling, training, purchasing, budgetary duties, performance evaluations and policy review. He has testified in court approximately 50 times.

On November 14, 2020, Rollins received a phone call from Sergeant Gradwahl about the incident at 19856 White Cloud Circle. Rollins was fast asleep at the time. Gradwahl told Rollins there was a disturbance between roommates, that the male roommate was acting erratically and barged into the female roommates room and jumped on her bed, that she left and came outside, that the male roommate may be on mushrooms and that they had tried several times to contact him and were unable to do so.

Gradwahl told Rollins that he was going to disengage and de-escalate from the house and back away rather than trying to force entry or make contact. Gradwahl did not tell Rollins that Birdwell reported ash marks or blood on Relloque's arm or that she reported the smell of burning flesh, and Gradwahl did not inform Rollins that there was a fire burning in the house. Gradwhal did not tell Rollins that Relloque kicked in Birdwell's locked door while he was naked. Rollins was not at the scene on 11/14/2020 and relied solely on the information Sgt. Gradwahl provided to him about the incidents that night at 19856 White Cloud Circle.

/ / /

CREIGHTON
& ROSE, PC

ATTORNEYS
AT LAW

735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

PAGE 27  PLAINTIFF'S WITNESS LIST

Rollins assigned de-escalation training for West Linn Police Officers on November 17, 2020. Rollins will also testify that Relloque's case was not one where criminal charges were warranted and authorized the mushrooms collected from the scene to be destroyed.

Rollins made no mention of the omission of information from Gradwahl in Gradwahl's performance evaluation 4 months later.

### 13.    Christine Salas (30 minutes) (209)992 9689

Christine Salas is Plaintiff's mother. She will describe her son growing up and his activities.  He was always very active and in sports and was very hopeful about his future.

After his injuries, she came as soon as possible to Oregon to be at her son's side. When she first learned of her son's conditions, the doctors were uncertain that he would survive his injuries. It was touch and go for the first few weeks. The doctors were amazed that he survived his injuries.  She will describe those first weeks in the hospital and the progress Relloque made while he was in the hospital. She will describe the moment that he first saw a mirror after his burns and his reaction.

She will testify about her visits while he was in the physical rehabilitation facility and the progress he made there. She will describe his coming back to California to continue his recovery and the care he received at home.

/ / /

/ / /

/ / /

CREIGHTON
& ROSE, PC

ATTORNEYS
AT LAW

735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

PAGE 28  PLAINTIFF'S WITNESS LIST

Relloque has overcome numerous physical challenges and life changes as a result of his injuries. She will describe her observations of these challenges and how he rose to meet them despite the tragedy he endured. He tried throughout to maintain a positive attitude and has made great strides in independent living.

14.    **Brian Salsbury (15 minutes)** (503) 649-8577 Tualatin Valley Fire & Rescue Station 58, 6050 Failing Street, West Linn, OR 97068

If the parties cannot come to an agreement about reading portions of Salsbury's deposition into the record, he will testify as follows:

Brian Salsbury is a firefighter and paramedic with Tualatin Valley Fire & Rescue, and has been for seventeen years. He has no supervisory authority as a firefighter/paramedic.

In the morning on November 14, 2020, Salsbury and his engine responded to a behavioral health call at White Cloud Circle, and that Lieutenant Jeff Cook was the officer-in-charge of TVF&R personnel at the time. He will testify that the engine was dispatched as "stage for police" and initially they staged at a church, before being asked by police through dispatch to move closer to the scene, which they did. When they moved closer as asked, they were still a few houses down from the scene of the incident. Police approached the engine and asked to borrow a ladder, which he retrieved from the engine, and they eventually returned.

/ / /

CREIGHTON & ROSE, PC

ATTORNEYS AT LAW

735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

PAGE 29  PLAINTIFF'S WITNESS LIST

Other than retrieving the ladder, he did not interact with the police on the scene about what was going on during the call. He will testify that when TVF&R is "staged for police" they are waiting for the "ok" from the police to enter the scene, and that TVF&R personnel cannot enter the scene until they receive the "ok" from the police to do so on "stage for police" calls. He will testify that Lieutenant Cook interacted with Police, and then informed the personnel in the engine that police had cleared them to leave the scene and return to the station, which they did.

He will testify that he wrote Supplemental Event Report (SER) in May of 2021, about 6 months after the incident, and that he was requested to write this report because there was "something going on with the call."

15.    **Toni Swanberg (15 minutes)** (503) 655-6214 West Linn Police

Department, 1800 8th Ave, West Linn, OR 97068

Toni Swanberg is the administrative assistant for the Chief of the WLPD. She will identify records requests and what she did to respond to those requests, if necessary at trial.

16.    **Charles R. Mueller, MD (60 minutes):** (503) 413-2200 Legacy Emanuel

Hospital, 501 N Graham St, Portland, OR 97227

Should the parties be unable to stipulate to the reasonableness and necessity of the medical treatment, he will be called to testify about the reasonableness and necessity of the medical treatment.

CREIGHTON
& ROSE, PC

ATTORNEYS
AT LAW

735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

17.     **Ashleigh Collard (60 minutes)** The Rawlings Company, Subrogation Operations Management 502 814 2605 AC13@Rawlingscompany.com

Should the parties be unable to stipulate to the reasonableness and necessity of the medical treatment, she or her successor will be called to testify about the reasonableness and necessity of the medical treatment and the reasonableness of the treatment.

DATED this 23rd day of December, 2025. CREIGHTON & ROSE, PC

        *s/ Beth Creighton*
        BETH CREIGHTON, OSB #972440
        E-mail: *beth@civilrightspdx.com*
        RICHARD E. OBERDORFER, OSB #013714
        E-mail: *Rich@civilrightspdx.com*
        KRISTIN BELL, OSB #235024
        E-mail: *kristin@civilrightspdx.com*
        Of Attorneys for Plaintiff

CREIGHTON & ROSE, PC | ATTORNEYS AT LAW

735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

PAGE 31  PLAINTIFF'S WITNESS LIST